CARE AND PROTECTION OF REBECCA & another.[1]

Franklin. September 13, 1994. - November 28, 1994.

Present: LIACOS, C.J., WILKINS, ABRAMS, NOLAN, LYNCH, O'CONNOR, & GREANEY, JJ.

*Child Abuse. Witness*, Child, Unavailability, Expert. *Evidence*, Sexual conduct, Credibility of witness, Hearsay, Expert opinion. *Due Process of Law*, Care and protection of minor, Standard of proof. *Minor*, Care and protection. *Parent and Child*, Care and protection of minor.

General Laws c. 233, § 83, authorizes, where the statutory prerequisites are met, the admission in evidence in a care and protection proceeding of out-of-court statements of children describing sexual abuse without regard to the availability of the child to testify. [75-77]

Where, implied in G. L. c. 233, § 83, and consequently inferred by this court, is the requirement that a judge assess the reliability of certain hearsay evidence authorized by that statute, the statute satisfies the due process requirements of the United States Constitution and art. 12 of the Massachusetts Declaration of Rights. [77-79]

This court set out procedures to be followed and factors to be considered by a judge in a care and protection proceeding when considering the reliability of hearsay statements admitted in evidence pursuant to G. L. c. 233, § 83. [79-81]

In a care and protection proceeding the judge's subsidiary findings that three children had been sexually abused by their mother lacked adequate evidentiary support, and where his conclusion that the mother was an unfit parent was based largely on a combination of unreliable and inadmissible evidence, the case was remanded for further proceeds. [81-85]

PETITION filed in the Greenfield Division of the District Court Department on December 14, 1989.

Following review by the Appeals Court, 31 Mass. App. Ct. 1118 (1991), the case was heard by *W. Michael Ryan*, J.

---

[1]Ruth, Rebecca's twin sister. As is our customary practice, most persons involved in this case are referred to by pseudonym.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Vida K. Berkowitz* for the mother.

*Robert B. Carlsen* for the minors.

*Ann Balmelli O'Connor* for Department of Social Services.

GREANEY, J. On December 14, 1989, the Department of Social Services (department), filed a care and protection petition pursuant to G. L. c. 119, § 24 (1992 ed.), seeking custody of Rebecca and Ruth,[2] twins born to Helen (mother) on April 15, 1981. The department was granted temporary custody of the twins on that day. On December 7, 1990, after a trial, a judge of the District Court adjudicated the children in need of care and protection and awarded custody to the department. In a memorandum issued pursuant to its Rule 1:28, the Appeals Court reversed the judgment and remanded the matter to the District Court for a further evidentiary hearing. 31 Mass. App. Ct. 1118 (1991). That hearing was held in February, 1992, before another District Court judge. On May 12, 1992, the judge entered a memorandum of decision, containing findings of fact, in which he concluded that the mother was incompetent to provide for Rebecca and Ruth's emotional and educational needs, had failed to protect them from sexual abuse, and had herself participated in their sexual abuse. He adjudicated Rebecca and Ruth in need of care and protection, and awarded the department custody of them until their eighteenth birthday.

---

[2] The petition filed by the Department of Social Services sought custody of Rebecca, Ruth, their younger half-brother, William, and their two step-brothers, Arnold and James. The petition was dismissed as to Arnold and James on December 5, 1991. The May 12, 1992, order entered by the judge, from which the mother and the children have appealed, pertains only to Ruth and Rebecca. The department informs us that the mother also has filed a notice of appeal from the judge's adjudication of William as a child in need of care and protection. That appeal is not before us, and the mother's failure to address in her brief issues related to the custody of William cannot be construed as a waiver of her appeal as to William.

On appeal, the mother and the children[3] argue that the judge's finding that the mother participated in the sexual abuse of her children was based in large part on hearsay evidence (out-of-court statements made by Rebecca, Ruth, and Arnold) that should not have been considered for its truth. In this regard, she contends that: (1) out-of-court statements made by the twins when they were under the age of ten did not meet the criteria for admissibility under G. L. c. 233, § 83 (1992 ed.), a statutory exception to the hearsay rule applicable to care and protection proceedings[4]; (2) the statements should not have been admitted because § 83 violates the due process and equal protection provisions of the Fourteenth Amendment to the United States Constitution and art. 12 of the Declaration of Rights of the Massachusetts Constitution; (3) in any event, the twins' out-of-court statements were not reliable evidence of sexual abuse; and (4) out-of-court statements made by the twins after their tenth birthday, relied on by the judge to bolster the evidence admitted under § 83, also were improperly admitted. The mother also contends that certain opinion evidence given by two psychologists, who testified as experts, should not have

---

[3]The mother and the children both have appealed. The issues raised by the children on appeal are identical to those raised by the mother. We shall refer in this opinion to issues raised by the mother.

[4]General Laws c. 233, § 83, inserted by St. 1990, c. 339, provides as follows:

"(a) Any out-of-court statements of a child under the age of ten describing any act of sexual contact performed on or with the child, the circumstances under which it occurred, or which identifies the perpetrator offered in an action brought under subparagraph C of section twenty-three or section twenty-four of chapter one hundred and nineteen shall be admissible; provided, however that the person to whom the statement was made, or who heard the child make the statement testifies, and the judge finds that the statement is offered as evidence of a material fact and is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable effort.

"(b) An out-of-court statement admissible by common law or by statute shall remain admissible notwithstanding the provisions of this section."

been admitted. If the finding of sexual abuse is discounted, the argument continues, there remains insufficient evidence on which to base a decision that the mother was unfit as a parent. We transferred the case to this court on our own motion. We conclude that much of the evidence relied on by the judge to support the finding that the mother sexually abused the children was either unreliable or inadmissible, and that its consideration was prejudicial to the mother. For this reason, we reverse the decision and remand the case to the District Court for further proceedings in accordance with this opinion.

1. *Background.* The following factual background, none of which was disputed, is drawn from the judge's findings. Rebecca and Ruth are children with special needs. They have displayed cognitive delays since they were toddlers, were two years behind their peers when they started school, and have been described by their therapist as "mildly retarded." The twins' mother separated from their father before their birth. Their father has never been involved in their care. In July, 1986, their mother gave birth to William, their half-brother.

In November, 1987, the mother's stepbrother began sexually abusing Rebecca. Ruth witnessed the abuse, and may also have been a victim. The abuse continued for about two months, when Rebecca reported it to a relative. The relative told the mother, who then reported the abuse to the proper authorities and took the twins to their pediatrician. The stepbrother was found guilty of indecent assault and battery.

In October, 1988, the mother married Simon, who had custody of his two young sons, Arnold and James. The five children lived with the mother and Simon until December, 1989, when all of the children were removed from the home and temporary custody of them was granted to the department.

2. *Evidence related to sexual abuse allegedly committed by the mother.* The mother's arguments concerning its admissibility and sufficiency require that we set out in detail the evidence on which the judge relied for his conclusion that

the mother had both condoned and participated in the sexual abuse of Rebecca and Ruth.

The children were removed from the home of the mother and Simon after Arnold reported sexual abuse inflicted by four persons including his father and his stepmother, both of whom were indicted. An investigator appointed by the court, see G. L. c. 119, § 24 (1992 ed.), interviewed Arnold shortly after the allegations were made. He told the court-appointed investigator (as he had told the investigator for the district attorney's office) that his stepmother touched him inappropriately and asked him to touch her inappropriately. He also alleged that he had watched while his stepmother made Rebecca and Ruth touch her inappropriately.[5]

Subsequently, Simon pleaded guilty to indecent assault and battery of Arnold and rape of James. The parties have stipulated that the criminal charges pending against the mother, based on Arnold's statement, were made subject to a nolle prosequi after Arnold disavowed his allegation concerning her.[6]

---

[5] On the mother's motion, the judge agreed to strike the section of the court-appointed investigator's report detailing Arnold's allegations that the mother had sexually abused Rebecca and Ruth.

The only other source for this information was an attachment to a report prepared by the department pursuant to G. L. c. 119, § 51B (1992 ed.), describing in detail a videotape of Arnold's responses to questions posed by an investigator for the district attorney's office. (The description of the videotape was prepared by a department employee.) The mother objected to admission of the attachment, and she moved to strike it. It is not clear from the record provided to this court whether the judge acted on the motion to strike, and, if so, what decision he reached.

This material was admissible for purposes of explaining the department's reasons for removing the children from the home of the mother and Simon. See Custody of Michel, 28 Mass. App. Ct. 260, 266-267 (1990) (§ 51A and § 51B reports are admissible to explain bringing of care and protection petition); Adoption of George, 27 Mass. App. Ct. 265, 271-274 (1989).

[6] In August, 1991, an assistant district attorney met with Arnold and told him charges were still pending against his stepmother, and that Arnold would have to testify about her actions. Arnold denied ever having said that his stepmother had "[done] anything" to him, and told a confused and improbable story suggesting that it was his brother, James, who had made the allegations. After having been shown a videotape of his ear-

While the twins were in their first foster care placement, they talked "about some stuff their brothers had done sexually to them," but said nothing about sexual abuse committed by their mother. While in their second foster care placement, they discussed the sexual abuse committed by the mother's stepbrother. When asked, they denied that their mother had abused them.

The twins' third foster placement was with a family who had a six year old daughter. In February, 1991, the foster parents became aware that the twins and their daughter were "playing house." The game, initiated by the twins, was similar to one they said they had played with their stepbrother Arnold, and involved the children touching one another's genitals. The foster parents told the children that this behavior was not appropriate for children, and that it could do them harm. The judge found that, during the following weeks, in a series of conversations, "[Rebecca and Ruth], first separately and then together, disclosed that [Simon] and [the mother] had 'touching problems;' that [Simon] had touched [Rebecca and Ruth] with his penis . . . that [their mother] was present when [Simon] touched the children and that she had touched their genitals and rubbed medicine on their privates. Both children indicated that the touching by both [Simon] and [their mother] hurt . . . that [Simon] and [their mother] told them not to tell anyone; that [Simon's] touching was with his hand and penis and [their mother's] was with her hands. Both [Ruth and Rebecca] indicated that rubbing of medicine on their vaginas by [their mother] was a 'bad' touching." (There was evidence that both children had suffered from scabies infections. The treatment for scabies was the application of an ointment which had to be applied to the entire body, including the genital area.)

lier interview, Arnold assured the assistant district attorney that if he, Arnold, had said his stepmother abused him and James, "then, it must have happened." Concluding that there were "evidentiary problems" with the case against the mother, the district attorney dropped the charges against her.

As a result of these disclosures, the children commenced therapy with Dr. Edward Plimpton.[7] He testified that, at some point during this therapy, Rebecca told him that her mother had touched her (Rebecca) "in her private parts." Ruth, although less forthcoming than Rebecca, said the same thing. Rebecca also told Dr. Plimpton that Simon had touched her with his penis, and that her mother's stepbrother had done the same thing. Based on his extensive interviews and therapy sessions with the children, Dr. Plimpton testified that, in his opinion, the mother's stepbrother "engaged in some inappropriate sexual conduct with [Rebecca]. That [Simon] engaged in some sexually inappropriate contact with [Rebecca]."[8] The judge's written findings also indicate that, in Dr. Plimpton's opinion, the twins were abused by Simon in their mother's presence.[9]

The court-appointed investigator interviewed Rebecca and Ruth on February 3, 1992, shortly before the trial began. The investigator reported: "I asked [Rebecca] why she was living in the [foster] home. She replied: 'because my mother touched me.' When I asked what she meant, she stated 'because my mother touched my vagina'. I asked what her mother touched her vagina with, and she said 'her hand'. I asked if it hurt when she touched her, and she nodded yes." Rebecca also said she could not remember whether the touching happened once, twice or more often, or whether anyone else was present when it occurred. In response to sim-

---

[7]Dr. Plimpton's name appears as "Plinpton" in the transcript, and the department has adopted this spelling for use in its brief, but it is clear from documents in the record that his name is "Plimpton," and we shall use the proper spelling.

[8]Dr. Plimpton also testified that, in his opinion, "the mother engaged in some inappropriate fondling with both girls." On objection by counsel for the mother, the judge struck this testimony. He explained in his written findings that "the record was not clear as to how Dr. Plimpton could distinguish between a sexual touching . . . and a touching required by the application of medicinal ointments for the treatment of scabies."

[9]The portions of the transcript provided to this court do not reflect such testimony by Dr. Plimpton, but the mother has not argued that the record lacks support for this finding.

ilar questions, Ruth said she was in foster care because her mother "had touched her in 'the privates.'" She could provide no information as to the frequency or circumstances of the touching. Ruth, but not Rebecca, also told the investigator that Simon had sexually abused her.

The court-appointed investigator also reported on her interview with the twins' third set of foster parents, who again recounted the twins' allegations of sexual abuse by their mother and Simon, adding some additional details concerning the alleged abuse by Simon, and an interview with Dr. Plimpton, who repeated his opinion that Simon had abused both girls in their mother's presence, and that the mother "'engaged in some inappropriate sexual behavior with these girls.'"

John Kolodin, therapist for the twins' half-brother William, testified to behavior on William's part that was, in his opinion, suggestive of sexual contact, and opined that the boy had been sexually abused.

Based on what he described as "the totality of the evidence," the judge concluded that Rebecca and Ruth had been sexually abused by Simon. As to the mother, the judge found:

> "Based on the totality of the evidence . . . that [the mother] was present when [Ruth and Rebecca] were abused by [Simon] and that she touched the genitals of her daughters in sexually inappropriate ways. Moreover . . . [the mother] failed to protect her children from sexual abuse by [her stepbrother], [Simon] and [Arnold]; [and] she failed to give her daughters any sense of security or to define for them boundaries of acceptable sexual conduct. . . . [The mother], by act and omission, allowed her daughters to become defenseless prey to myriad sexual deviates."

The judge also found that the mother "engaged in inappropriate sexual touchings of [Arnold] and [James]." He based

these findings

> "on the totality of the evidence including the testimony
> of the experts, the statements of [Ruth and Rebecca]
> made to [one of their foster parents in their third foster
> placement] prior to their tenth birthday, the investiga-
> tor's reports, the stipulations of the parties, the exhibits,
> the convictions of [the mother's stepbrother] and [Si-
> mon] which gave credibility to the statements of [Re-
> becca and Ruth], the testimony and demeanor of [the
> mother] as a witness and her reactions to other testi-
> mony during the course of the trial, and the testimony
> of witnesses about the conduct of [Ruth, Rebecca, and
> William]. No one portion or piece of evidence was es-
> sential to this finding; it was the accumulation of vast
> evidence from multiple sources that made these findings
> inescapable, inevitable and unavoidable."

3. *Admissibility and probative value of statements related to sexual abuse.* Rebecca and Ruth, who did not testify, told their third set of foster parents that Simon had abused them sexually in their mother's presence, and that their mother had touched them inappropriately. These statements, describing acts of sexual misconduct, identifying a perpetrator, and made before the children's tenth birthday (April 15, 1991), were testified to by the person who heard them. The statements were admitted as substantive evidence of sexual abuse by the mother based on the provisions of § 83. See note 4, *supra*. The mother argues, nonetheless, that the prerequisites for admission under § 83 were not met because the legislation contains an implicit requirement that the judge find a child declarant unavailable before admitting such evidence.[10]

---

[10]The department's contention that the mother failed to preserve this issue is without merit. The mother repeatedly objected to the admission of the children's statements to the foster parents and explained to the judge the basis for her objection.

Also without merit is the department's assertion that the mother made no attempt to call the children. The mother informed the judge that she

The mother bases this argument on language in § 83 ("the statement [must be] offered as evidence of a material fact and [must be] more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable effort"), which tracks the language of Rules 803 (24) and 804 (5) of the Federal Rules of Evidence, the residual hearsay exceptions. Despite the fact that the availability of the declarant is immaterial to the admission of evidence under Fed. R. Evid. 803 (24), the mother contends the exception generally does not apply when the declarant is available, and she reasons from this that the Legislature would not have included the "more probative" language if it had intended to create a presumption that a child under the age of ten was unavailable. We disagree.

Section 83 was enacted by St. 1990, c. 339, which amended G. L. c. 233 by the insertion of three new sections addressing the admissibility of out-of-court statements of child sexual abuse victims. General Laws c. 233, §§ 81 and 82, also enacted by St. 1990, c. 339, which apply, respectively, to criminal proceedings and to civil proceedings other than care and protection proceedings, explicitly require the proponent of an out-of-court statement made by a child under the age of ten to "demonstrate a diligent and good faith effort to produce the child" and "specific findings on the record" demonstrating unavailability. The circumstances in which a declarant may be found unavailable are carefully delineated. This unavailability requirement is conspicuously absent from § 83. "[W]here the Legislature has employed specific language in one [section of an act], but not in another, the language should not be implied where it is not pres-

---

intended to call the children as witnesses and that it was her position that the children were incompetent. It is apparent from the transcript that she was requesting a voir dire on the children's competence as a matter bearing on the reliability of their out-of-court statements. It can be inferred that the mother intended to call the children if the judge determined they were competent. The judge, however, informed the mother she would not be permitted to call a witness she believed to be incompetent and did not conduct a voir dire.

ent." *Beeler* v. *Downey*, 387 Mass. 609, 616 (1982). See *Til-con Mass., Inc.* v. *Commissioner of Revenue,* 30 Mass. App. Ct. 264, 269 (1991). The Legislature obviously intended to authorize the introduction of out-of-court statements by a child under the age of ten concerning sexual abuse in care and protection proceedings without regard to the availability of the child, where the remaining statutory prerequisites for admissibility are met.

We also are satisfied that § 83 satisfies the due process requirements of the United States Constitution and art. 12. Questions related to the standard of proof in care and protection proceedings are tested by reference to the due process analysis contained in *Mathews* v. *Eldridge*, 424 U.S. 319, 335 (1976), which requires the balancing of three factors, "(1) 'the private interest that will be affected by the official action'; (2) 'the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards'; and (3) 'the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.' " *Care & Protection of Robert*, 408 Mass. 52, 59 (1990).

The interests implicated in a care and protection proceeding include the parent's and the child's very significant interests in the continuance of their familial relationship. Those interests are not absolute; they are tempered by a child's paramount interest in freedom from abuse and neglect, including familial sexual abuse, *id.* at 61-62, and they must be weighed against the Commonwealth's strong interest in the welfare of the children of the Commonwealth. *Id.* at 65. See *Lassiter* v. *Department of Social Servs. of Durham County, N.C.*, 452 U.S. 18, 27 (1981); *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 587 (1981).

The point in contention is whether the provisions of § 83 increase the risk that a judge in a care and protection proceeding will conclude, erroneously, that sexual abuse has occurred. The mother argues that the legislation is infirm for

several, related reasons. Unlike §§ 81 and 82 of G. L. c. 233, § 83 does not require that, before admitting a child's out-of-court statement related to sexual abuse, the judge make a specific finding that the statement carries with it strong guarantees of its reliability.[11] The limitation on admissibility in § 83, that the statement be "more probative on the point for which it is offered than any other evidence," might, in practice, prove to be no limitation. There are few, if any, witnesses to familial child abuse and physical corroboration is often absent. See *Opinion of the Justices*, 406 Mass. 1201, 1204-1205 (1989); Note, A Comprehensive Approach to Child Hearsay Statements in Sex Abuse Cases, 73 Colum. L. Rev. 1745, 1749-1750 (1983). Thus, a child's out-of-court statements could be viewed by a judge as the most probative evidence the department can produce when it is alleged that sexual abuse has occurred. The risk of error inherent in the admissibility of statements that have not been tested for reliability is compounded, according to the mother, because the legislation also presumes that a child whose statements were made when the child was under the age of ten is unavailable, thus ensuring the child's out-of-court statements will not be tested by cross-examination. Cf. *Adoption of Carla*, 416 Mass. 510, 514 (1993) (when child does not testify judge may not have means by which to assess credibility and accuracy of child's statements). As we shall explain below, we conclude that a judge who has before him out-of-court statements admitted under § 83 must consider the reliability of those statements. So construed, § 83 strikes a permissible balance between the competing interests involved in a care and protection case.

*Opinion of the Justices, supra*, and much of the pertinent literature, confirm the difficulty in assessing an allegation of

---

[11]General Laws c. 233, §§ 81 and 82, also inserted by St. 1990, c. 339, both provide that an out-of-court statement made by a child under the age of ten related to sexual abuse is admissible if it is found that (a) a child is unavailable; and (b) the judge makes the additional finding that the statement "was made under circumstances inherently demonstrating a special guarantee of reliability," based on a list of enumerated factors.

child sexual abuse. As has been previously noted, there generally are no witnesses to an act of abuse other than the victim and the perpetrator. Corroborative evidence often will be lacking. A youthful victim, although truthful, may be a poor witness, may refuse, or may be unable, to testify. Guilt about breaking up the family or a child's desire to remain with his or her parents may prompt a retraction of a truthful allegation of abuse. It also has been suggested that a child's memory fades rapidly, and that statements made closer in time to incidents of abuse may be more accurate. *Id.* at 1204-1205. See Finn, Child Witness Practice in Child Abuse Proceedings, 23 Suffolk U.L. Rev. 271, 275-276 (1989); Note, 73 Colum. L. Rev., *supra* at 1751. Section 83 embodies a legislative judgment that out-of-court statements made by young victims of sexual abuse may be evidence of significant value to the judge who sits as the finder of fact in a care and protection case.

The judge in a care and protection case is required, however, to treat this evidence with caution. The proponent of evidence meeting the criteria for admissibility of § 83 may offer the evidence, but implied in the statute is a requirement that a judge assess the reliability of such evidence in connection with deciding how much weight to accord to it. We infer this requirement from traditional principles governing the use of hearsay evidence and from the specific provisions of § 83.

Statements admitted pursuant to § 83, must be introduced through the person to whom the statement was made or who heard the child make the statement. This person, therefore, is subject to cross-examination regarding the timing of the statement, the circumstances in which it was made, the language used by the child, and the child's apparent sincerity, or motive, in making the statement. Cf. *Gilmore* v. *Gilmore*, 369 Mass. 598, 603-605 (1976); *Adoption of George*, 27 Mass. App. Ct. 265, 274 (1989). These are important factors bearing on the reliability of a young child's statement concerning an incident of sexual abuse. See *People ex rel. M.W.*,

374 N.W.2d 889, 893-894 (S.D. 1985) (in case of physical abuse, circumstances surrounding child's hearsay statements provided indicia of reliability). See also Note, 73 Colum. L. Rev., *supra* at 1751, 1758. In addition, there may be evidence as to the consistency over time of a child's statements concerning abuse, or, as in this case, there may be expert testimony about a child's ability to remember and to relate his or her experiences, or other relevant personality traits. Although evidence may be admitted pursuant to § 83, even if the child declarant is available, the legislation certainly does not foreclose the judge from holding a voir dire to assess the child's capacity to remember and to relate, and the child's ability to perceive the necessity of telling the truth.

In deciding what weight to give to statements admitted pursuant to § 83, a judge also should consider whether other admissible evidence corroborates the existence of child abuse. This might include, for example, evidence that a child displays knowledge of sexual matters beyond his or her years or engages in sexually explicit behavior, see *Commonwealth* v. *Amirault*, 404 Mass. 221, 225 (1989), or physical evidence consistent with sexual abuse. *Id.* at 226.

Certain statutory exceptions to the hearsay rule, applicable in care and protection proceedings, appear to reflect a legislative judgment that the judge who sits as finder of fact requires access to evidence from many sources, some of which may be in hearsay form, but which may nevertheless be relied on for its truth. See *Adoption of Carla, supra* at 512, 514. See also *Custody of Tracy*, 31 Mass. App. Ct. 481, 485-486 (1991); *Custody of Michel*, 28 Mass. App. Ct. 260, 266 (1990). To ensure integrity in the decision-making process, we additionally require that the judge's reasons for relying on § 83 evidence must appear clearly in the specific and detailed findings the judge is required to make in a care and protection case. See *Care & Protection of Laura*, 414 Mass. 788, 791 (1993). See also *Custody of Eleanor*, 414 Mass. 795, 799 (1993). So long as these safeguards are observed,

we are satisfied that § 83 will not increase the likelihood of an erroneous result in a care and protection proceeding.[12]

4. *Sufficiency of evidence of sexual abuse.* Subsidiary evidentiary findings in a care and protection case, including a finding that sexual abuse has occurred, must be proved by a fair preponderance of the evidence properly before the judge. See *Care & Protection of Laura, supra* at 793. A judge's findings must be left undisturbed "absent a showing that they are clearly erroneous." See, e.g., *Custody of Eleanor, supra* at 799, and cases cited. "A finding is clearly erroneous when there is no evidence to support it, or when, 'although

---

[12]The mother also claims that her right to equal protection is violated because the threshold for the admission of an out-of-court statement related to sexual abuse made by a child under the age of ten is lower in care and protection proceedings than it is in the other civil proceedings governed by G. L. c. 233, § 82. This argument is without merit. Because the mother's right to her familial relationship with her child is at stake in a care and protection proceeding, the Commonwealth is required to provide procedural safeguards adequate to ensure the fair and accurate resolution of such cases. See *Department of Pub. Welfare* v. *J.K.B.*, 379 Mass. 1, 3-4 (1979) (substantive due process right in familial relationship requires adequate due process protection). The legislation at issue, St. 1990, c. 339, does not effect a classification based on race, alienage, national origin, or religion, see *Commonwealth* v. *King*, 374 Mass. 5, 21 (1977), nor do the statutory classifications, which are related to a point of procedure, " 'directly and substantially' interfere with family living arrangements." *Lyng* v. *Castillo*, 477 U.S. 635, 638 (1986). The distinction between care and protection proceedings, and other civil proceedings, therefore, needs only be rationally related to a legitimate government purpose. *Id.* at 638-639. See *Michael H.* v. *Gerald D.*, 491 U.S. 110, 131 (1989). An adjudication under G. L. c. 119, § 26, that a child is in need of care and protection, while a significant intrusion, does not represent a total termination of parental rights, as does a proceeding to dispense with consent to adoption brought under G. L. c. 210, § 3 (1992 ed.), which is, therefore, appropriately governed by the more stringent standards of G. L. c. 233, § 82. As the mother points out, most of the other civil proceedings to which the more stringent standards of § 82 apply are between private parties. These proceedings do not implicate the Commonwealth's interest in protecting children at risk of abuse and neglect. The Legislature rationally could conclude that the need for out-of-court statements is diminished in these circumstances. In addition, in private disputes over custody, it is possible that fewer resources will be devoted to investigation, thus increasing the risk that evidence in the form of a child's out-of-court statements would not be properly evaluated in the absence of additional procedural safeguards.

there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.*, quoting *Building Inspector of Lancaster* v. *Sanderson*, 372 Mass. 157, 160 (1977).

Here, there were circumstances casting serious doubt on the reliability of the statements made by Rebecca and Ruth to their third pair of foster parents that their mother had sexually abused them. The children's statements admitted pursuant to § 83 appear to relate to the mother's application of medicine in the children's genital area, an act for which there was a medical justification. Due to possible confusion on this ground, the judge was unwilling to accept Dr. Plimpton's opinion that the mother had touched Rebecca and Ruth inappropriately. The statements admitted pursuant to § 83, made immediately after the girls had been told that touching in the genital area was wrong, or bad, would appear to suffer from the same infirmity. Both Dr. Plimpton and the court-appointed investigator also indicated that the children were exceptionally eager to please; for this reason, they were not viewed as entirely reliable informants. Despite the mother's request, however (see note 10, *supra*), the judge did not conduct a voir dire to aid his assessment of the reliability of their allegations.

Much of the other evidence relied on by the judge to bolster the statements admitted under § 83 was objected to and not properly before him. The twins' statements to the court-appointed investigator (that they were in foster care because their mother had touched them in the genital area) could not be relied on for their truth because the mother was foreclosed from cross-examining the children. See *Adoption of Carla, supra* at 514 (hearsay in investigator's report is allowable for its truth only when there is opportunity for cross-examination of the sources of the statements).[13] The fact

---

[13]The statements could not be admitted under § 83 because they were made after Rebecca and Ruth reached the age of ten. The mother's right to cross-examination was brought to the judge's attention during a collo-

that the statements made by Rebecca and Ruth, which were admitted pursuant to § 83, also appear in the investigator's report, does not render the statements admissible for their truth on the basis of G. L. c. 119, §§ 21 and 24. Hearsay contained in an investigator's report is admissible for its truth when there is an opportunity to "refute the investigator *and the investigator's sources* through cross-examination and other means." *Adoption of Carla, supra* at 514, quoting *Custody of Michel, supra* at 266. With respect to the statement of a child under the age of ten related to sexual abuse, "other means" must refer to the determination required under § 83 that such evidence is reliable. The service plans prepared by the department, which referred to sexual abuse allegedly committed by the mother, were admitted only as evidence that the department perceived this as a problem, and not for the truth of the assertion that the mother had committed sexual abuse.

Statements by the twins to Dr. Plimpton, about which he testified in the course of explaining the basis for his expert opinion, could not be relied on for their truth. See *Nancy P.* v. *D'Amato*, 401 Mass. 516, 524-525 (1988); P.J. Liacos, Massachusetts Evidence § 7.10.3, at 422 (6th ed. 1994). Dr. Plimpton's expert opinion testimony, to the effect that the twins had been sexually abused, was inadmissible under cases decided by this court and the Appeals Court. See *Commonwealth* v. *Colin C., ante* 56, 59-61 (1994); *Commonwealth* v. *Rather*, 37 Mass. App. Ct. 140, 147 (1994). His testimony identifying the persons who had abused the twins, and opining that their mother had been present, amounted in essence to testimony that he believed the statements made to him by the twins, and was equally inadmissible. *Commonwealth* v. *Colin C., supra* at 59-61. The testimony by William's psychologist was similarly flawed.

The judge relied on his conclusion that the mother had sexually abused Arnold and Joseph to support his finding

quy on the admissibility of the children's out-of-court statements. See note 10, *supra.*

that she also had abused her own daughters. However, the finding as to Joseph and Arnold also appears to lack adequate evidentiary support. The judge could not rely on the § 51B report to support this finding. See *Custody of Michel,* *supra* at 266-267; *Adoption of George, supra* at 271-274. Because Arnold, the principal source of information on this point, was not available for purposes of cross-examination, his statements to the court-appointed investigator concerning sexual abuse by his stepmother were not admissible for their truth. See *Adoption of Carla, supra.*[14] Their possible admissibility under § 83 was not tested, and their reliability appears dubious in view of Arnold's later retraction of his accusations against his stepmother.

There was admissible evidence raising doubt about the mother's ability to provide an adequate home for Rebecca and Ruth. However, the finding that the mother had committed and condoned the sexual abuse of her daughters, a finding central to the judge's conclusion that she was an unfit parent, was based largely on a combination of unreliable and inadmissible evidence. "[T]he judge's reliance on evidence improperly considered by him makes it impossible for this court to say with confidence that the result would have been the same if the judge had not considered that evidence." *Care & Protection of Benjamin,* 403 Mass. 24, 27-28 (1988). The judgment adjudicating Rebecca and Ruth in need of care and protection and committing them to the custody of the department until their eighteenth birthday is vacated. The case is remanded for further proceedings in light of this opinion and any changes in the situation of the mother and the children since the February, 1992, hearing.[15]

*So ordered.*

---

[14]The mother objected to the admissibility of this portion of the court-appointed investigator's report, pointing out that since Arnold was living in Tennessee, she could not call him for cross-examination.

[15]On remand, the finding that the mother has been resistant and uncooperative to the department's efforts at reunification should be considered carefully. The department insisted that sexual offender counselling was a

prerequisite to reunification, and based its assertion that the mother was uncooperative in part on her failure to undertake such counselling. Where there is some reason to doubt that the mother engaged in sexual misconduct with the children, it may be that the department's demand was unwarranted in this respect and did not justify the conclusion that the mother had failed to cooperate in efforts at reunification.