ADOPTION OF DAISY.[1]

No. 09-P-1837.

Norfolk. January 13, 2010. - September 23, 2010.

Present: GRASSO, COHEN, & SIKORA, JJ.

Further appellate review granted, 458 Mass. 1112 (2011).

*Adoption,* Care and protection, Dispensing with parent's consent, Visitation rights. *Minor,* Adoption, Visitation rights. *Parent and Child,* Adoption, Dispensing with parent's consent to adoption, Interference with parental rights, Testimony by child against parent. *Practice, Civil,* Adoption, Hearsay. *Department of Children & Families. Evidence,* Hearsay, Expert opinion. *Witness,* Expert.

In proceedings to terminate the mother's right to consent to the adoption of her daughter, the judge did not err in ruling that the child's hearsay statements concerning sexual abuse by her father were admissible, in lieu of her live testimony, pursuant to G. L. c. 233, § 82, where the statute applied to statements the child had made when she was younger than ten years of age, even though she was more than ten years of age at the time of trial [777-778]; where the mental health professional who testified at a hearing on the admissibility of the statements on the question of the child's unavailability was sufficiently involved in the child's treatment to be an appropriate witness [778-780]; where there was no merit to the claim that the mental health professional lacked adequate qualifications [780]; and where the mental health professional's testimony was neither equivocal nor speculative, and provided an adequate basis for the judge's findings [780].

In proceedings to terminate the mother's right to consent to the adoption of her daughter, lapses by the Department of Children and Families (department) in securing an appropriate therapist for the child did not require dismissal of the petition or reversal of the decision to terminate the mother's parental rights, where there was no indication that the department acted arbitrarily or irrationally [781-782]; further, in the circumstances of the case, the department did not abuse its discretion in not providing the mother visitation [782-783].

At the trial on a petition to terminate the mother's right to consent to the adoption of her daughter, the judge did not abuse her discretion in declining to order the child to have posttermination or postadoption contact with the mother. [783]

At the trial on a petition to terminate the mother's right to consent to the adoption of her daughter, the evidence was sufficient to justify the judge's conclusion that termination of the mother's parental rights was in the best interests of the child. [783-784]

---

[1]We use pseudonyms for the names of the child and her siblings.

PETITION filed in the Norfolk County Division of the Juvenile Court Department on November 3, 2006.

The case was heard by *Mary M. McCallum*, J.

*Henry C. Porter* for the mother.

*Muriel Ann Finnegan* for Department of Children and Families.

*Roberta Mann Driscoll* for the child.

COHEN, J. This child welfare case was initiated in November, 2006, after the minor child, Daisy, disclosed that she was being sexually abused by her father. On February 4, 2008, a judge of the Juvenile Court approved a stipulation by Daisy's mother and father that Daisy was in need of care and protection and committed Daisy to the permanent custody of the Department of Children and Families (department).[2] Thereafter, a termination trial was held over several days in September and October, 2008, resulting in decrees, dated January, 2009, terminating the parental rights of both Daisy's father and mother.

As to the father, the grounds for the judge's decision was his sexual abuse of Daisy, coupled with his complete failure to cooperate with the department or participate in any services. As to the mother, the judge concluded that termination was warranted because of protective concerns arising from the mother's inability to accept that the father was the perpetrator of the abuse, and because the mother's relationship with Daisy had deteriorated during the course of the case to the point where Daisy was unwilling to have any contact with her. The judge did not find that the mother knew or had reason to know of the father's actions or that she was abusive or neglectful in any other respect.

The mother, but not the father, has appealed, claiming that the trial judge erroneously admitted Daisy's hearsay statements concerning sexual abuse in lieu of her live testimony, pursuant to G. L. c. 233, § 82; that the department abused its discretion by failing to provide therapeutic services that would have made it possible to return Daisy to the mother's care, and by suspending visits with the mother without court authorization; and that the judge erred in not ordering posttermination contact. At oral argument, this court raised, sua sponte, the additional issue of

---

[2] We use the current name of the agency formerly known as the Department of Social Services.

the sufficiency of the evidence and the judge's subsidiary findings to support the decree with respect to the mother, and requested and received supplemental memoranda on this issue from the parties. After consideration of all of these issues, we affirm.

*Background.*[3] The department's involvement with Daisy and her family began on November 2, 2006, when Daisy, then nine years old, informed a school counsellor that her father routinely sexually abused her. The same day, Daisy was transported to the hospital for a pediatric rape examination, where it was found that she did not have a hymen. The department promptly obtained custody of Daisy, referred the matter to the district attorney's office, and placed Daisy in a residential program for purposes of obtaining an assessment. While there, Daisy made additional statements concerning the abuse to the program director. Later, while in foster care and hospitalized for pneumonia, Daisy discussed the abuse with her treating physician. She also described the abuse to a court-appointed investigator. In each of these disclosures, Daisy unequivocally identified the father as the perpetrator. Although her descriptions of what transpired contained minor discrepancies, she consistently reported profoundly abusive acts of molestation and rape perpetrated by the father on a routine basis.

As of the conclusion of the termination trial, criminal charges had not been brought against the father. During a SAIN (sexual abuse intervention network) interview conducted in the course of the district attorney's investigation, Daisy made no disclosures or statements regarding any form of sexual contact with any person. As found by the judge, Daisy appeared uncomfortable and emotionally upset during the interview.[4] When asked about telling the truth, Daisy stated, "sometimes the truth can hurt [one's] heart." She remained silent, except for answering introductory questions, and the interview was concluded after only ten minutes.

Daisy's mother was born in Haiti, where she completed the

---

[3]We rely on the findings made in conjunction with the judge's order pursuant to G. L. c. 233, § 82, the findings made after the termination trial, and additional facts not subject to dispute.

[4]A videotape of the interview was played during the G. L. c. 233, § 82, hearing, and introduced in evidence at the termination trial.

eleventh grade. She has been a dietary counsellor (employed at the same rehabilitation facility for nineteen years) and is active in her church. Prior to commencing her relationship with the father, the mother was married and divorced twice. By her first marriage, the mother has an older daughter, Brittany, who was approximately eighteen years old at the time of the termination trial. Daisy's father also originally is from Haiti. Although he and the mother never married, they were together for more than eleven years. In addition to Daisy, the father has four children from other relationships, including a son Jeffrey, who was twenty-one years old at the time of trial. At all relevant times, the father was employed as a taxicab driver, working twelve hours per day, seven days per week — typically leaving for work in the mid-afternoon and returning home at around 3:00 A.M.

Before the department's involvement with the family, the mother, father, Brittany, Jeffrey, and Daisy all lived together in a four-bedroom split-level duplex. The deed to the home was in the mother's name alone, with the father contributing to household expenses. During the father's relationship with the mother, he had a girlfriend with whom he had a son, Matthew, who is the same age as Daisy. Following Daisy's report of sexual abuse, the mother complied with the department's request to have the father move out of the family residence. The father and Jeffrey then moved in with the father's girlfriend and her two children — Matthew, and the girlfriend's teenage daughter from another relationship. They live in the same community as the mother, only one-half to one mile away.[5]

After the father's move to his girlfriend's house, the father and mother continued to have contact. The father considered there to be no problem in their relationship, and the mother acknowledged speaking to him over the telephone once in a while.

From the outset, the mother had great difficulty accepting Daisy's allegations. While eventually able to acknowledge that Daisy was sexually abused, the mother could not accept that the father was the perpetrator. Early on, when Daisy was in residential treatment, the mother mentioned to the program director

---

[5]At the time of trial, it was uncertain whether the mother would continue to reside in her house. She was in arrears in her mortgage payments, faced potential foreclosure, and had been attempting to sell the property without success.

that she was unable to believe Daisy's accusation unless she heard it directly from Daisy. The director therefore arranged a session with Daisy and her mother, at which Daisy told her mother what the father had done. The mother became extremely upset and emotional, and kept repeating that a father should never do such a thing to a child. Upon hearing Daisy's disclosures, the mother literally collapsed, sliding off her chair and onto the floor. The mother was physically distraught and having trouble breathing. The adults present assisted the mother, and at one point, Daisy went to the mother's side and held her hand to give her comfort. The mother asked Daisy why she never told her about the sexual abuse, and Daisy responded that she did not want her father to go to jail and did not want her parents to separate. The mother kept repeating that a father should never do such a thing to a child. At the end of the session, the mother was so distraught that her older daughter, Brittany, was enlisted to drive her home.

Even after this session, however, the mother continued to tell the director of Daisy's program that she could not believe that the father would have done this to Daisy. The director recommended that the mother seek out and participate in individual therapy, obtain educational information about the impact that sexual abuse has on a family, and seek support and assistance from her church. Participating in individual therapy also was the primary task recommended by the department in the mother's various service plans.

Through her primary care physician the mother obtained a referral to a therapist affiliated with Harvard Vanguard Medical Associates (HVMA). While the record reveals that the therapist was well-credentialed, she did not have experience with treating parents of sexually abused children.

The mother regularly met with the HVMA therapist from December, 2006, until February, 2008. During the course of this therapy, the mother dealt with her grief over the possibility that the father may have abused Daisy, but also explored her belief that the more likely perpetrator was the father's son, Jeffrey, because he often was alone with Daisy.[6] The HVMA therapist

_____

[6]Jeffrey picked Daisy up from school every day and apparently was alone with her for some part of the afternoon. However, Daisy's father also regularly was alone with Daisy. The mother, Brittany, and Jeffrey left the house early in

supported the mother in this belief, going so far as to contact the department to make inquiries about its investigation. Viewing this as counterproductive to potential reunification, the department requested that the mother find another therapist who specialized in counselling parents raising a sexually abused child. By the time of a hearing held on November 27, 2007, it was contemplated that the mother would be obtaining a new therapist, but this did not occur for several months.

In March, 2008, the mother obtained referrals from both the department and the HVMA therapist. Following leads given to her by the HVMA therapist, the mother met with a new therapist, but after two or three visits, the new therapist terminated the relationship,[7] and the mother did not seek further treatment. At the time of trial, in the fall of 2008, the mother no longer was in counselling with any provider and still had not come to terms with Daisy's accusations. In her trial testimony, the mother expressed continued disbelief that the father had abused Daisy, even after hearing extensive testimony about Daisy's disclosures.[8]

The mental health services provided by the department to Daisy also was an issue in the case. At different times, both counsel for the child and counsel for the mother sought court intervention to secure appropriate evaluation and treatment of Daisy. Early on, in a report made available to the parties on January 26, 2007, the court investigator noted that a contemplated trauma evaluation had never taken place due to Daisy's transfer from her initial residential placement into a foster home. The investigator recommended that the department immediately refer Daisy for a trauma evaluation that would provide the department with an outline for therapeutic interventions and course of treatment, and also recommended that the mother receive services to

---

the morning, leaving the father in charge of waking Daisy and readying her for school. Daisy reported that the abuse took place at night (after the father came home from work) and in the morning before she went to school.

[7] The judge found that "the therapist felt she would not be an appropriate person to counsel the mother." However, the underlying reasons remain murky. The therapist, herself, did not testify. The mother testified that the therapist thought the situation was "a big mess" and did not want to work on the case.

[8] At trial, the mother also acknowledged explaining to a court clinic evaluator that the father's girlfriend had used voodoo to make Daisy "confused" so that the girlfriend could have the father back.

learn about and prepare for the expected behaviors that Daisy might exhibit as she therapeutically processed the abuse.

Despite the investigator's report, the department made no arrangements for a trauma evaluation, nor did it seek a court order for one. A trauma evaluation was arranged only after a court order was obtained at the behest of Daisy's counsel, on April 2, 2007. The evaluation was not completed until October 25, 2007, some eleven months after the court investigator raised the issue. Among other things, the evaluator recommended that Daisy, who was in treatment with a therapist who lacked experience with child sexual abuse, would benefit from working with a therapist who was experienced in that area.

Again, the department did not act upon this recommendation until the court intervened. On November 27, 2007, the judge entered an order upon a motion brought by the mother for a finding of abuse of discretion, ruling that unless the recommendations of the trauma evaluator were implemented and achieved by December 31, 2007, the judge would deem the department's lack of effort to be an abuse of its custodial responsibilities. The department finally provided Daisy with an experienced child sexual abuse therapist in January, 2008. By this point, however, the department already had changed Daisy's permanency goal to adoption[9] because of the mother's inability to acknowledge that Daisy was abused by her father and because of growing difficulties between Daisy and her mother.

Originally, the mother was permitted weekly visits with Daisy — first supervised, then unsupervised. Unsupervised visits were terminated, however, after an incident in January, 2007, when the mother and Daisy's older sister Brittany made remarks that upset Daisy. They asked Daisy why she was making her disclosures about the father and why she "didn't keep it in the family." The mother also asked Daisy to forgive her father because he loved her and missed her.[10]

After this episode, all visits were supervised and took place

---

[9]The judge found that the department had changed its goal by December, 2007. The record indicates that a change in goal may have been discussed as early as October, 2007.

[10]At trial, Brittany and the mother denied having made these statements, but the judge found otherwise.

every other week at the department's office through December, 2007.[11] At visits, the mother would bring Daisy's favorite foods, clothes, and toiletries. The two would play games and enjoy each other's company, and the mother would speak to Daisy in affectionate terms. The mother also adhered to the department's directions not to converse with Daisy in Haitian Creole or to discuss the care and protection case or the issues involved.

It is evident from the record that, as time went on, Daisy developed a strong desire to confront the mother with the mother's disbelief of Daisy's accusations against the father. This was a matter of significant concern, as reflected in the transcript of the November 27, 2007, hearing, where the judge and counsel discussed a court clinic evaluation in which Dr. Christine Darsney cautioned that visitation should not be a place for confrontation and that any discussion between Daisy and her mother concerning the mother's disbelief would require appropriate groundwork and a therapeutic setting in order for it to be safe and productive.

The concern turned out to be well-founded. At a visit on December 12, 2007, which was being supervised by a department social worker, Daisy asked the mother directly whether the mother believed Daisy with regard to the abuse. When the mother did not respond, based on the overwhelming advice and instructions she had received not to discuss these issues, Daisy became extremely upset with the mother's silence, left the room, and thereafter refused to visit with her again. In writing about this episode, the judge found: "The mother's literal compliance with this request and her resulting silence at that critical visit has severely devastated her relationship with [Daisy]. However, much more crucial than the mother's silence at that visit was her essential disbelief in her daughter's abuse and her complete inability to express her support, acceptance or acknowledgment of [Daisy] and the child's disclosures. The mother's disbelief and inability are the real reasons that the child has rejected the mother and refuses to accept any contact whatsoever from the mother."

Initially, the mother thought it best not to force Daisy to attend visits, feeling that the situation would be temporary and

---

[11]The reduction in frequency was in accordance with the wishes of Daisy, who was finding visitation with her mother to be stressful.

that Daisy would change her mind; however, that did not occur. Several months later, in May, 2008, the mother asked the department to resume scheduling visits, but Daisy continued to refuse to see her mother, and the department did not schedule them. In June, 2008, the mother filed a motion for an order finding that the department had abused its discretion by not providing visitation, to which the department responded with a motion to suspend visitation. Concluding that, as a practical matter, the department was not in a position to force eleven year old Daisy to attend visits against her will, the judge denied the mother's motion and allowed that of the department, with the proviso that visits were to be suspended only if Daisy continued to refuse to see the mother and only until further order of the court. No further visits took place, and by the time of trial, it was Daisy's position, as conveyed by her attorney, that she had no desire to have any contact with her mother and hoped to be adopted.

Just before the termination trial, the judge held an evidentiary hearing pursuant to G. L. c. 233, § 82, to determine whether the department would be permitted to introduce Daisy's out-of-court statements to four individuals (her school counsellor, the director of the residential program she entered when first removed from her home, the pediatrician who treated her when she was hospitalized for pneumonia, and the court investigator) describing acts of sexual contact performed on or with her by her father. Daisy, who was born on July 26, 1997, was under the age of ten when she made the statements but had now reached the age of eleven. After five days of hearing, and over the objections of the mother and father, the judge ruled that the statements were admissible, having found that Daisy was unavailable because of her vulnerability to severe psychological or emotional trauma were she to testify and that her statements were made under circumstances demonstrating a special guarantee of reliability.

The termination trial commenced immediately thereafter. The judge found that both parents were unfit and, to a near certitude, were likely to continue to be unfit in the indefinite future; that the best interests of Daisy would be served by terminating the mother's and father's parental rights; that the department's proposed plan for Daisy — recruitment of an adoptive family — was a suitable one; and that parental visitation by the mother,

as well as the father, was not in Daisy's best interests. Because Daisy desired to have future contact with Brittany, her older half-sister, the judge ordered that, absent changes in circumstances brought to the attention of the court, the department should continue to arrange such visitation on a regular basis.

*Discussion.* 1. *Rulings pursuant to G. L. c. 233, § 82.* The mother contends that the judge erred in ruling that Daisy's hearsay statements concerning sexual abuse by the father were admissible pursuant to G. L. c. 233, § 82, inserted by St. 1990, c. 339 (§ 82). Subsection (*a*) of § 82 provides:

> "The out-of-court statements of a child under the age of ten describing any act of sexual contact performed on or with the child, the circumstances under which it occurred, or which identifies the perpetrator shall be admissible as substantive evidence in any civil proceeding, except proceedings brought under subparagraph C of section twenty-three or section twenty-four of chapter one hundred and nineteen; provided, however, that the statement is offered as evidence of a material fact and is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; the person to whom the statement was made or who heard the child make the statement testifies; the judge finds pursuant to subsection (*b*) that the child is unavailable as a witness; and the judge finds pursuant to subsection (*c*) that the statement is reliable."

As both the Supreme Judicial Court and this court have observed, this statute "strikes a balance between the parents' due process right to rebut evidence and the State's need to protect children." *Adoption of Quentin,* 424 Mass. 882, 892 (1997). *Adoption of Arnold,* 50 Mass. App. Ct. 743, 752 (2001).

a. The mother's threshold argument with respect to the judge's § 82 rulings is that the statute was not intended to apply to a child who no longer was under ten years of age at the time of trial. While there is some logic to the mother's position that the statute likely was designed to protect children from having to testify when they are under the age of ten, the statute refers to "statements of a child under the age of ten," thereby indicating that it is the age of the child when the statements were made

that is the determinative consideration.[12] Furthermore, two cases — *Care & Protection of Rebecca*, 419 Mass. 67 (1994), and *Adoption of Arnold, supra* — implicitly have accepted the latter interpretation.[13] We therefore conclude that the judge correctly ruled that, because Daisy was under the age of ten when she made the statements, the statute applied.

b. The mother's second argument is that the mental health professional who testified at the § 82 hearing on the question of Daisy's unavailability was not a proper witness. Under § 82(*b*), unavailability may be found "based upon expert testimony from a treating psychiatrist, psychologist, or clinician, that testifying would be likely to cause severe psychological or emotional trauma to the child." At the time of the § 82 hearing, Daisy had been in treatment for eight months with a therapist, Merrily Harris, who had expertise in treating child victims of sexual abuse; however, it was not Harris who testified.

Prior to the § 82 hearing, a guardian ad litem (GAL) had been appointed to investigate whether it was in Daisy's best interests to waive the psychotherapist-patient privilege so that Harris could testify at trial. The GAL concluded that it was not in Daisy's best interests, because Daisy only recently had begun to develop a trusting relationship with Harris, and there was a significant risk of harm to the relationship if Harris were to testify. The GAL also was of the opinion that the information

---

[12]By choosing to phrase the statute in this way, it would appear that the Legislature concluded that there are good reasons why children ten years old or older should be insulated from having to testify about sexual abuse disclosed by them at an earlier age, e.g., lack of adequate memory or likelihood of severe psychological trauma as a result of revisiting what transpired.

[13]In *Care & Protection of Rebecca*, 419 Mass. at 75-81, the subject children were more than ten years of age at the time of the proceedings. The Supreme Judicial Court distinguished between statements made by them before they reached the age of ten (which were potentially admissible as "statements of a child under the age of ten" as long as their reliability was established and procedural safeguards observed), and statements made after they reached the age of ten, which would not be admissible. *Id.* at 82 n.13.

*Adoption of Arnold*, 50 Mass. App. Ct. 743, was a termination of parental rights case holding that there was no error in the admission, pursuant to § 82, of out-of-court statements made by two children when they were under ten years of age. Although the point now argued by the mother was not discussed, it is evident from the dates contained in that decision that one of the children, Alex, no longer was under the age of ten at the time of trial.

possessed by Harris was readily available from nonprivileged sources.

The mental health professional who testified at the § 82 hearing was Elizabeth Palladino, a licensed independent clinical social worker who specializes in the clinical evaluation and treatment of sexually abused children. Palladino had conducted a trauma evaluation of Daisy during the summer of 2007 and met with Daisy again in August, 2008, for the purpose of evaluating her ability to testify. She saw Daisy three times in connection with the trauma evaluation (each session lasting two to two and one-half hours), and once prior to the § 82 hearing, in a session lasting two hours. After voir dire, the judge qualified Palladino as an expert in the specific discipline of providing clinical treatment to and conducting clinical evaluations of children who have experienced trauma from sexual abuse and, hence, an appropriate witness to testify at the hearing. Palladino then opined that if Daisy participated in the trial she would be at significant risk of harm. See note 16, *infra*.

The mother contends that the judge erred in permitting Palladino to testify, because the statute requires that the expert be the child's treating therapist and not merely a therapist who treats children clinically. We note, however, that the statute speaks of "*a*" (not "the child's") treating psychiatrist, psychologist, or clinician, thereby suggesting that expertise as a treatment provider, and not a treating relationship with the subject child, is the critical prerequisite.

In any event, we need not decide the question, because we conclude that Palladino was sufficiently involved in the child's treatment to be an appropriate witness even under the mother's interpretation of the statute. In performing her trauma evaluation, Palladino diagnosed Daisy and made recommendations for follow up by others in much the same way that any medical specialist might see a patient in order to lay the groundwork for subsequent ongoing treatment by the patient's primary provider. The fact that she also updated her evaluation in order to testify at the § 82 hearing does not diminish the significance of her role in treating Daisy; Palladino plainly was not merely an outside expert who reviewed Daisy's case solely for the purpose of testifying. To the extent that Palladino may have been less familiar with Daisy than her regular therapist, it was for the

judge to take that into account in assessing the weight of the testimony.[14]

c. There is no merit to the mother's related argument that Palladino lacked adequate qualifications as an expert in the clinical evaluation and treatment of children exposed to sexual trauma. "The admission of expert testimony is 'largely within the discretion of the trial judge and will be reversed only where it constitutes an abuse of discretion or error of law.' " *Adoption of Hugo*, 428 Mass. 219, 232 (1998), quoting from *Commonwealth* v. *Pikul*, 400 Mass. 550, 553 (1987). Here, the evidence on voir dire revealed that Palladino had substantial training and experience in both evaluating and treating children with a history of sexual trauma. Neither her prior inexperience as a testifying expert nor her frequent provision of services to children involved with the department required that she be found unqualified. There was no abuse of discretion.

d. The mother's remaining arguments with respect to the § 82 hearing concern the substance of Palladino's testimony and whether it provided sufficient support for the judge's findings that Daisy would suffer severe trauma were she to participate in the proceedings and that no reasonable accommodations could be made to avert the trauma.[15] It is true, as the mother points out, that some of Palladino's testimony was phrased in terms of possibilities. Nevertheless, the testimony, taken as a whole, was neither equivocal nor speculative, and it provided an adequate basis for the judge's findings.[16]

---

[14]As it turns out, the views of the child's ongoing therapist, Harris, also were explored during Palladino's testimony. Palladino explained that she had spoken with Harris and learned that Harris supported Daisy's expressed desire to confront her parents in court. Palladino accounted for the difference of opinion by explaining that Harris was not aware of Daisy's previous attempts to confront her mother and the severe distress that Daisy experienced when the confrontation did not have the intended effect of eliciting the mother's agreement and support.

[15]The mother makes no argument on appeal concerning the judge's finding that the statements were reliable.

[16]In brief, Palladino's testimony established that Daisy was a fragile and disturbed child who had been suffering from posttraumatic stress disorder, low self-esteem, nightmares, guilt, intrusive thoughts, fear of her father, and behavioral issues, including aggression and sexually reactive behaviors. While Daisy had made some progress since Palladino's initial evaluation of her, Palladino had "great concern" about the effects upon Daisy of testifying, noting

2. *Adequacy of department's efforts.* The mother claims that had it not been for the department's poor handling of the case, reunification could have been achieved or, at a minimum, Daisy would not have come to the point where she desired no contact with the mother. It is well-established that a parent must raise a claim of inadequate services in a timely manner. See *Adoption of Gregory*, 434 Mass. 117, 124 (2001). Accordingly, while the mother's brief refers to a number of alleged deficiencies in the department's handling of the case, we limit our consideration to those which the mother properly raised below, in this instance by means of motions for findings of abuse of discretion.

a. In November, 2007, the mother filed a motion claiming that the department had abused its discretion by failing to secure an appropriate therapist for Daisy, claiming that Daisy's existing therapist lacked experience and training in the treatment of sexually abused children and had impeded Daisy's progress and movement towards reunification. At a hearing held on November 27, 2007, the judge showed great sensitivity to the difficulties that were developing between Daisy and her mother as a result of Daisy's need for her mother's affirmation and the mother's inability to accept Daisy's accusations. The judge therefore ordered the department to implement, by December 31, 2007, the clinical recommendations contained in the then recently completed trauma evaluation of Daisy, which included a recommendation that Daisy be provided with a specialized therapist. A new therapist for Daisy finally was put in place in January, 2008.

At the November 27, 2007, hearing, it also was contemplated that the mother, too, would be obtaining a new therapist with

---

that merely talking about it during their recent session together had resulted in Daisy having intrusive thoughts and fears on the way back to her foster home. Daisy had unmet needs and feelings of guilt arising from her father not being prosecuted and her mother failing to acknowledge what had happened and, despite having been counselled on what the trial would be like, persisted in believing that she would be able to confront her parents directly at the trial and "fix" these problems. Because Daisy was unable to appreciate that her participation would not necessarily lead to her father's arrest or her mother's acceptance, she would be bound to be disappointed and at clinical risk of regression. This would be the case even if accommodations were made, such as modified seating arrangements, videotaping, or being interviewed in the judge's chambers. Given Daisy's misperceptions, playing a direct role in the trial would be "traumatizing," would result in "harm," and would leave her "frustrat[ed] and confus[ed]."

more appropriate expertise. However, the mother continued with her old therapist until the end of February, 2008, and then pursued referrals that she was given in March, 2008. She ultimately saw a new therapist two or three times, but when that therapist terminated the relationship, the mother engaged in no further counselling.

The department was "required to make reasonable efforts to strengthen and encourage the integrity of the family before proceeding with an action designed to sever family ties," *Adoption of Lenore*, 55 Mass. App. Ct. 275, 278 (2002), but its "obligation to work with the mother was contingent upon her own obligation to fulfill various parental responsibilities, including seeking and utilizing appropriate services." *Adoption of Serge*, 52 Mass. App. Ct. 1, 9 (2001).[17] While we do not condone the department's lapses in securing appropriate therapy for Daisy, or discount the possibility that they played a role in escalating the deterioration of the relationship between Daisy and her mother, the mother's own delay in obtaining appropriate therapy for herself undermines the mother's argument.

In any event, even if the department's handling of the case markedly contributed to the deterioration of the relationship between Daisy and the mother, neither dismissal of the petition (as requested by the mother) nor reversal and remand would be an appropriate remedy. There is no indication that the department acted arbitrarily or irrationally. Furthermore, "the proper focus of termination proceedings is the welfare of the child." *Adoption of Gregory*, 434 Mass. at 121. As we explain below, viewed from that perspective there is no basis to disturb the decree.

b. The mother also filed a motion in early June, 2008, alleging that the department had abused its discretion by not providing the mother with visitation since December, 2007, and by not getting court approval for suspending visitation. However, after the disastrous visit of December 12, 2007, the mother chose not to press the issue of visitation, believing that it would be better to wait for the child to change her mind. It was not until May,

---

[17]Even if we consider the mother to have adequately preserved her further argument that the department also abused its discretion in failing to provide her and Daisy with family therapy, the department did not abuse its discretion where it acted on the basis of expert advice that family therapy was not advisable until the mother had made individual progress.

2008, that the mother requested that visits be resumed, but Daisy remained adamant in refusing them. As the judge reasoned when she denied the mother's motion and allowed the department's cross-motion to suspend visitation, the department did not abuse its discretion because, as a practical matter, it was not in a position to force an eleven year old child to attend visits against her will. The judge's analysis was sound.

3. *Posttermination and postadoption contact.* Given Daisy's refusal to have any contact with the mother and the grave damage sustained by their relationship, we are unable to conclude that the judge abused her discretion in declining to order that Daisy have posttermination or postadoption contact with the mother. We note, however, that Daisy's attorney and the department have ongoing obligations to Daisy during the period between termination and adoption. Accordingly, should Daisy's wishes change and contact with the mother become desirable from her perspective, they can fulfil those obligations by bringing the issue before the judge for review and redetermination. See G. L. c. 119, § 26.

4. *Sufficiency of the evidence and the judge's findings.* After close review of the record, the concerns that animated our request for additional briefing on the sufficiency of the evidence and the judge's findings have been allayed. Our review has assured us that the judge properly could conclude that the mother's persistent disbelief of the child's accusations against the father was unreasonable and unlikely to change and that her disbelief made it unsafe to return Daisy to her care. While the findings do not identify the precise nature of the safety risk to Daisy in specific terms, we think it implicit in the judge's decision (and amply supported by clear and convincing evidence) that Daisy would be unsafe in her mother's care in two particular respects: first, because of the risk that Daisy would be exposed to the father, who lived close by and who remained in contact with the mother; and, second, because the mother would be incapable of meeting Daisy's acute psychological need for support and acceptance in order to recover from the trauma that she sustained. Furthermore, in view of the amount of time that had transpired without progress towards reunification, Daisy's complete rejection of the mother, and Daisy's desire to move on and be adopted,

the judge was well-justified in concluding that it was in the best interests of Daisy that the parental rights of the mother be terminated.[18]

*Conclusion.* For the foregoing reasons, the decree is affirmed.

*So ordered.*

---

[18]We emphasize, however, that, like all cases, this one turns on its specific facts. Research suggests that parental responses to a child's disclosure of sexual abuse are varied; that it is not uncommon for nonoffending mothers of a child victimized by incestuous abuse to react with disbelief and denial; and that neither belief nor disbelief in the child's allegations correlates neatly with a nonoffending mother's capacity to be supportive and protective. See Elliott & Carnes, Reactions of Nonoffending Parents to the Sexual Abuse of their Child: A Review of the Literature, 6 Child Maltreatment 314, 316-317 (2001).