## ADOPTION OF OLIVETTE.[1]

No. 10-P-858.

Plymouth. November 3, 2010. - March 25, 2011.

Present: BERRY, SMITH, & GREEN, JJ.

*Adoption,* Dispensing with parent's consent. *Parent and Child,* Dispensing with parent's consent to adoption. *Minor,* Adoption. *Child Abuse. Evidence,* Hearsay, Child custody proceeding, Unavailable witness, Expert opinion. *Practice, Civil,* Adoption, Hearsay. *Witness,* Child, Competency, Unavailability, Expert.

Discussion of G. L. c. 233, § 82, governing the admissibility in civil proceedings of out-of-court statements of a child under ten years of age describing sexual contact with the child. [144-147]

In the circumstances of a proceeding to determine the admissibility of a child's out-of-court statements, pursuant to G. L. c. 233, § 82, at the trial of a petition to dispense with the need for parental consent to the adoption of a child, the judge did not err in declining to make a separate finding on the question of the child's competence, where the judge found the child unavailable to testify for reasons independent of any concern that the child might be incompetent [147-148]; further, the judge did not abuse his discretion in concluding that the child's out-of-court statements were reliable, where his detailed findings of fact reflected careful consideration of the factors enumerated in § 82(c), specifically addressing in particular the child's cognitive limitations and history of making false statements [148-150]; moreover, the judge did not abuse his discretion in concluding that the child's out-of-court statements were corroborated by independently admitted evidence such as the child's sexualized behavior and age-inappropriate knowledge of sexual matters [150], as well as expert testimony concerning the child's observed behavior in and around the shower at the facilities where she was housed [150-152], and although instances of expert testimony that amounted to vouching were erroneously admitted, the judge specifically eschewed reliance on those portions of the experts' opinions [152]; finally, where the judge explicitly credited expert testimony expressing concern that the child would suffer sever emotional trauma should she be subject to cross-examination regarding her allegations of abuse, this court discerned no cause to disturb the decrees by reason of the judge's conclusion that accommodations regarding the manner in which the child might testify would not adequately eliminate the risk of harm to her if she were required to testify [152-155].

At the trial of a petition to dispense with parental consent to the adoption of a child, the admission in evidence of the judge's findings from a pretrial

[1]A pseudonym.

proceeding to determine the admissibility of a child's out-of-court statements, pursuant to G. L. c. 233, § 82, did not, absent a showing of prejudice, warrant reversal of the decrees dispensing with parental consent [155-156].
At the trial of a petition to dispense with parental consent to the adoption of a child, the judge's conclusion regarding the father's unfitness was clearly supported by evidence of the child's allegations of sexual abuse, which the judge concluded were reliable [156-157]; further, the judge did not err in terminating the mother's parental rights, where sufficient evidence supported the judge's finding that the mother was unfit [157-158].

PETITION filed in the Barnstable County Division of the Juvenile Court Department on December 19, 2007.

The case was heard by *James J. Torney, Jr.*, J.

*Andrew L. Cohen*, Committee for Public Counsel Services, for the father.

*Henry C. Porter* for the mother.

*Richard A. Salcedo* for Department of Children and Families.

*Robert E. Curtis, Jr.*, for the child.

GREEN, J. Among the claims of error raised by the parents in their appeals from decrees terminating their parental rights is the claim that the trial judge erred in admitting hearsay testimony concerning the child's allegations of sexual abuse pursuant to G. L. c. 233, § 82. We conclude that the judge did not abuse his discretion in concluding that the testimony satisfied the requirements of § 82; discerning no merit in the parents' other claims of error, we affirm the decrees.

*Background.* Olivette was born on May 8, 1999. She was placed in foster care in February, 2001, when she was nineteen months old. After several initial foster placements, she was placed with the father and mother, who previously had served as foster parents for a number of temporary foster child placements. In September, 2002, the parental rights of Olivette's biological parents were terminated, and her adoption by her foster parents was finalized the following spring. In 2004, the father and mother voluntarily closed their foster home to enable them to concentrate their attention on Olivette. However, the father and mother separated in late 2006 and divorced in October, 2007. During and after the periods of separation and divorce, the couple agreed that Olivette would continue to live with the father but continue to see the mother.

On December 10, 2007, while riding in a car with her teacher, Olivette (who was then eight years old) commented that she hoped to receive a "Baby Alive" doll for Christmas so that she could nurse it. The teacher responded that she had nursed her own children and that it was a "great thing." Olivette then commented that when she was a baby she had "nursed from daddy's pee pee." The following day, Olivette said to the same teacher, "[P]lease don't tell, it's a secret, I used to suck on his 'pee pee.' Mommy wasn't home, it was milk — it tasted like baby's milk." In a subsequent sexual abuse intervention network (SAIN) interview (which was not videotaped), Olivette stated that she had "sucked" her father's "pee pee" in the shower twice and that it was "a secret." She asked if she could draw pictures to help her describe her answers, and explained to the interviewer that "baby's milk" comes out of "boys' pee pees." Asked whose "pee pee," she responded, "my dad's." Asked when this had occurred, she responded that it occurred when her mother was "not home." Asked her father's name, she responded with the father's first name. Olivette further stated that she knew that baby's milk comes out of her father's "pee pee" because she drank it. The interviewers observed Olivette rubbing her vaginal area vigorously while making those statements. We shall reserve further description of the details and circumstances of Olivette's statements describing sexual abuse by the father for our discussion of his challenge to their admission in evidence.

Asked to respond to Olivette's statements, the father denied having assaulted her. He explained that he used to shower with her when she was little, but that he stopped doing so following an occasion on which she touched his penis. He further stated that she has learning disabilities and that on a recent school field trip she had visited a farm where she had seen cows being milked. The mother stated that she did not believe Olivette's disclosures and that she was not interested in taking custody of her.

On December 19, 2007, the Department of Children and Families (department) filed a petition seeking care and protection of Olivette. After a seventy-two-hour hearing in early January, 2008, Olivette was placed in the temporary custody of the department. In November of the same year, the department moved to admit Olivette's out-of-court statements describing

sexual abuse by the father, pursuant to G. L. c. 233, § 82; several weeks later, before the hearing on the department's motion, the department filed notices of its intent to seek decrees terminating the father's and mother's parental rights.

Beginning on March 18, 2009, and continuing over four non-consecutive days through April 10, 2009, the judge conducted a hearing on the admissibility of Olivette's out-of-court statements. On June 11, 2009, the judge issued findings of fact and rulings of law in which he explained his conclusion that Olivette's statements satisfied the requirements for admission under § 82.[2] After a trial on three nonconsecutive days in August, 2009, the judge issued findings of fact and an order directing issuance of decrees dispensing with the need for parental consent to Olivette's adoption.

Both parents have appealed, raising a variety of issues. We address each in turn.

*Discussion.* a. *Admissibility of Olivette's out-of-court statements under G. L. c. 233, § 82.* The parents' principal challenge is to the judge's decision to admit Olivette's out-of-court statements in evidence, pursuant to G. L. c. 233, § 82 (the provisions of which are set out in the margin).[3] In particular, the parents contend that (i) the judge should have found Olivette incompetent and, based on a finding of incompetence, excluded

---

[2]Specifically, the judge expressed his conclusion that her statements were "strong evidence" of the alleged abuse, and more probative on the issue than any other evidence that could be produced through the department's reasonable efforts. He further concluded that Olivette was unavailable to testify at trial, by reason of the trauma she would suffer if required to testify, and that her out-of-court statements were reliable.

[3]General Laws c. 233, § 82, inserted by St. 1990, c. 339, provides as follows:

> "(a) The out-of-court statements of a child under the age of ten describing any act of sexual contact performed on or with the child, the circumstances under which it occurred, or which identifies the perpetrator shall be admissible as substantive evidence in any civil proceeding, except proceedings brought under subparagraph C of section twenty-three or section twenty-four of chapter one hundred and nineteen; provided, however, that such statement is offered as evidence of a material fact and is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; the person to whom such statement was made or who heard the child make such statement testifies; the judge finds pursuant to subsection (b) that

her out-of-court statements; (ii) the judge erred in finding that Olivette's out-of-court statements were reliable; and (iii) the

the child is unavailable as a witness; and the judge finds pursuant to subsection (c) that such statement is reliable.

"(b) The proponent of such statement shall demonstrate a diligent and good faith effort to produce the child and shall bear the burden of showing unavailability. A finding of unavailability shall be supported by specific findings on the record, describing facts with particularity, demonstrating that:

"(1) the child is unable to be present or to testify because of death or existing physical or mental illness or infirmity; or

"(2) by a ruling of the court, the child is exempt on the ground of privilege from testifying concerning the subject matter of such statement; or

"(3) the child testifies to a lack of memory of the subject matter of such statement; or

"(4) the child is absent from the hearing and the proponent of such statement has been unable to procure the attendance of the child by process or by other reasonable means; or

"(5) the court finds, based upon expert testimony from a treating psychiatrist, psychologist, or clinician, that testifying would be likely to cause severe psychological or emotional trauma to the child; or

"(6) the child is not competent to testify.

"(c) If a finding of unavailability is made, the out-of-court statement shall be admitted if the judge further [finds: (1) after holding a separate hearing, that such] statement was made under oath, that it was accurately recorded and preserved, and there was sufficient opportunity to cross-examine; or (2) after holding a separate hearing and, where practicable and where not inconsistent with the best interests of the child, meeting with the child, that such statement was made under circumstances inherently demonstrating a special guarantee of reliability.

"For the purposes of finding circumstances demonstrating reliability pursuant to clause (2) of subsection (c) a judge may consider whether the relator documented the child witness's statement, and shall consider the following factors:

"(i) the clarity of the statement, meaning, the child's capacity to observe, remember, and give expression to that which such child has seen, heard, or experienced; provided, however, that a finding under this clause shall be supported by expert testimony from a treating psychiatrist, psychologist, or clinician;

judge should have conducted a voir dire examination of Oli-vette herself, on the questions of her competence and the reli-ability of her statements.[4]

Section 82 of c. 233 of the General Laws is one of a trio of statutes enacted by St. 1990, c. 339, creating exceptions to the hearsay rule for out-of-court statements of a child under ten years of age describing sexual contact with the child. General Laws c. 233, § 81, addresses admissibility of such statements in criminal proceedings, § 82 addresses their admissibility in most civil proceedings, and § 83 addresses their admissibility in care and protection proceedings.[5] The Supreme Judicial Court has discussed the constitutionality of each section, in dictum,

----

"(ii) the time, content and circumstances of the statement;

"(iii) the existence of corroborative evidence of the substance of the statement regarding the abuse including either the act, the circumstances, or the identity of the perpetrator;

"(iv) the child's sincerity and ability to appreciate the conse-quences of the statement.

"(*d*) An out-of-court statement admissible by common law or by statute shall remain admissible notwithstanding the provisions of this section."

The bracketed language in subsection (*c*) appears in the Acts and Resolves but does not appear in the bound editions of the General Laws.

[4] In their briefs, the parents also argue that the statements do not fall within § 82 because Olivette was ten years old by the time of trial. After the parties filed their briefs, but before oral argument, this court concluded that the age of the child at the time she makes the statements, rather than at the time of trial, determines whether § 82 applies. See *Adoption of Daisy*, 77 Mass. App. Ct. 768, 777-778 (2010). On January 4, 2011, the Supreme Judicial Court al-lowed the application of the mother in that case for further appellate review, with review limited to that question. 458 Mass. 1112 (2011). According to the docket of the Supreme Judicial Court, the case was argued on March 8, 2011. Pending further guidance from the Supreme Judicial Court, however, our holding in *Adoption of Daisy* controls the issue.

[5] "In *Opinion of the Justices*, 406 Mass. 1201, 1204 (1989), the Justices analyzed a bill which was the precursor to the statutory scheme now embodied in G. L. c. 233, §§ 81-83. The proposed bill (Senate No. 795) would have al-lowed out-of-court statements of children under the age of ten who were victims of sexual assault to be admitted in circumstances which did not reach that measure of necessity and reliability found in other hearsay exceptions. *Opinion of the Justices, supra* at 1211, 1216. The Justices were of opinion that the legislation did not strike the proper balance between the State's inter-est in protecting children and a defendant's right to confrontation embodied in

concluding that each appears to strike an appropriate balance between applicable constitutional concerns and the State's need to protect children, provided that certain procedural safeguards are observed. See *Commonwealth* v. *Colin C.*, 419 Mass. 54, 62 (1994) (§ 81); *Adoption of Quentin*, 424 Mass. 882, 892 (1997) (§ 82); *Care & Protection of Rebecca*, 419 Mass. 67, 77 (1994) (§ 83).[6] "These procedures include: (1) giving prior notice to the party against whom such statements will be used; (2) showing by more than a mere preponderance of the evidence a compelling need for use of the hearsay statements; (3) conducting any necessary separate hearings on the record regarding the reliability of a child witness's out-of-court statements and issuing specific findings which present the basis upon which the reliability of the statements was determined; and (4) requiring independently admitted evidence that corroborates the out-of-court statement." *Adoption of Arnold*, 50 Mass. App. Ct. 743, 752 (2001). Against that backdrop, we consider the parents' challenges to the judge's conclusion that the requirements of § 82 were met in the present case.

As a threshold matter, we reject the father's contention that an out-of-court statement of an incompetent child is categorically inadmissible. The language and structure of § 82 suggest strongly that a statement might be admissible even though the child declarant is incompetent, since it establishes incompetence as one of the bases upon which a child may be found unavailable to testify, under § 82(*b*)(6), as an initial predicate to admissibility of her statement; we consider it unlikely that the Legislature would have intended that subsection to apply only in instances where a young child was competent at the time she made the out-of-court statement concerning sexual abuse but became incompetent before the time of trial. Moreover, in *Commonwealth* v. *Colin C.*, *supra* at 65, the court explicitly discussed

art. 12 [of the Massachusetts Declaration of Rights]. *Id.* at 1216-1218." *Adoption of Quentin*, 424 Mass. 882, 890-891 (1997).

[6] In the present case, the constitutional right at issue is the due process right of parents to rebut evidence in cases seeking termination of their parental rights. See *Adoption of Quentin*, *supra* at 889, 892. The present case does not require us to consider the effect of *Crawford* v. *Washington*, 541 U.S. 36 (2004), on the analysis contained in *Commonwealth* v. *Colin C.*, *supra*, of a criminal defendant's confrontation rights.

the possibility that statements of an incompetent child might be admissible under the cognate statutory exception created by § 81:

> "Although the trial judge has discretion in finding both unavailability and reliability under G. L. c. 233, § 81, we note that, if the judge determines that the child is unavailable because she is 'incompetent to testify,' the judge's reasons for finding the child incompetent should not be those that call into question the reliability of the child's out-of-court statements. For example, if the trial judge finds that the child witness is incompetent to testify because the child is unable to tell the truth at the time of trial or does not know the consequences of not telling the truth in court, the judge should exercise extreme caution in allowing that child's out-of-court statements in evidence pursuant to G. L. c. 233, § 81."

Though the quoted language counsels extreme caution in admitting out-of-court statements of an incompetent child, it does not erect a categorical prohibition, instead resting the ultimate question of admissibility in such circumstances on a finding of reliability. In the present case, the judge found the child unavailable to testify for reasons independent of any concern that the child might be incompetent. It accordingly was unnecessary for the judge to make a formal finding on the child's competence; any questions concerning the child's competence instead were encompassed within the judge's consideration of the reliability of the statements. There was no error in the judge's failure to make a separate finding on the question of the child's competence.

The same evidence on which the parents base their contention that the judge should have specifically found Olivette incompetent is nonetheless material to their contention that the judge erred in finding her out-of-court statements reliable. See *Commonwealth* v. *Colin C.*, 419 Mass. at 65. Separately, the parents challenge the judge's conclusion that Olivette's out-of-court statements are corroborated by independently admitted evidence. We review the judge's ruling for abuse of discretion. See *Adoption of Arnold*, 50 Mass. App. Ct. at 753-754.

Section 82(c) lists several specific factors for a judge to

consider in assessing whether an unavailable child's out-of-court statement is reliable: (i) the clarity of the statement[7]; (ii) the time, content, and circumstances of the statement; (iii) the existence of corroborative evidence of the substance of the statement[8]; and (iv) the child's sincerity and ability to appreciate the consequences of the statement.

As we have previously observed, the judge in the present case conducted a four-day hearing on the department's motion to admit Olivette's out-of-court statements under § 82. He heard testimony from twelve witnesses, including the teacher to whom Olivette made her initial disclosures and several expert witnesses who interviewed Olivette thereafter. His detailed findings of fact reflect careful consideration of the factors enumerated in § 82(c). In particular, his findings specifically address the most serious of the parents' contentions: that Olivette's statements should be considered unreliable by reason of her cognitive limitations[9] and some history of making false statements[10]; the judge acknowledged both concerns, in the process explaining his conclusion that Olivette's allegations of sexual abuse are reliable despite those concerns.[11] To a large extent, the parents' remaining challenges to the judge's findings concerning reliability and corroboration amount to quarrels with the judge's resolution of con-

[7]The statute further explains that "clarity of the statement mean[s] the child's capacity to observe, remember, and give expression to that which such child has seen, heard, or experienced; provided, however, that a finding under this clause shall be supported by expert testimony from a treating psychiatrist, psychologist, or clinician." G. L. c. 233, § 82(c)(i).

[8]The statute specifies that such corroboration should address "either the act, the circumstances, or the identity of the perpetrator." G. L. c. 233, § 82(c)(iii).

[9]There was evidence that Olivette has an I.Q. of 48 and functions at the level of a four or five year old child.

[10]Olivette's teacher described an elaborate (but wholly untrue) story Olivette told her about owning a puppy. Olivette also told a former daycare provider that her mother had killed several dogs and had died and that her mother had been arrested after she moved out of the home; none of those stories was true.

[11]The judge explained that he found her statements reliable, despite her cognitive limitations, by reason of the clarity and detail included in them, the matter of fact manner in which she made them, and their consistency over time. On the subject of past fabrications, the judge likewise explained that "despite past fabrications and stories, [Olivette's] statements of sexual abuse are credible because of the manner in which she alleged them and the specificity contained therein."

tested issues of fact, or with the judge's assessment of the appropriate weight due certain evidence bearing on reliability; such considerations are, of course, the province of the trial judge acting as finder of fact. See *Adoption of Quentin*, 424 Mass. at 886 n.3. Several of the parents' claims nonetheless warrant discussion.

The judge found that Olivette's allegations were corroborated by, among other factors, evidence that she displayed sexualized behavior and age-inappropriate awareness of sexual matters and male genital anatomy. The father argues that such behavior and awareness could be explained by the possibility of sexual abuse before she came into the father's custody, or by abuse at the hand of another (albeit unidentified) perpetrator.[12] Without evidence corroborating the identity of the alleged perpetrator, the father argues, evidence that merely corroborates generally the fact of abuse cannot satisfy the corroboration requirement of § 82. To the contrary, our cases have routinely recognized a child's sexualized behavior or age-inappropriate knowledge of sexual matters as corroborative of an allegation of sexual abuse, without imposing an additional requirement that corroborative evidence corroborate the identity of the alleged perpetrator. See, e.g., *Care & Protection of Rebecca*, 419 Mass. at 80; *Adoption of Arnold*, 50 Mass. App. Ct. at 753. See also *Adoption of Quentin*, 424 Mass. at 889. Moreover, the express terms of § 82 provide guidance: in describing corroborative evidence it provides that such evidence may include "either the act, the circumstances, *or* the identity of the perpetrator" (emphasis added). G. L. c. 233, § 82(*c*)(iii). Listing identity among corroborative factors in the disjunctive militates strongly against imposing corroboration of identity as an absolute requirement.

The father also criticizes the judge's reliance on expert testimony concerning the child's observed behavior in and around the shower at the facilities where she was housed while in the department's custody as corroborative of her allegations that her father had abused her while the two were in the shower together at her former home.[13] In particular, the father contends that the experts impermissibly applied "confirmation bias" in their as-

---

[12]The father did not argue in the trial court that a different perpetrator had abused Olivette.

[13]According to one witness, Olivette had a difficult time showering; she

sessment of the child's behavior, interpreting even opposing facts to confirm a predetermined hypothesis.[14] As the father observes, a fact and its opposite cannot both serve to corroborate the same assertion. However, the father contends, the experts found corroboration in diametrically opposed facts, and the judge adopted their view of the corroborative effect.

We agree with the father that the possibility of confirmation bias in cases such as this is significant, and particularly as to evidence that is corroborative only in a general or indirect manner. However, the father overstates the potential for such bias in the examples he cites. Concerning the amount of time Olivette spent in the shower, the evidence was not both that she spent an excessive amount of time in the shower and that she loathed or feared going into the shower. Instead, the evidence was that she feared going into the shower and that her fear was manifested on occasion by spending excessive periods of time in the bathroom with the shower running (sometimes to the point of flooding the bathroom floor) without going into the shower itself. Similarly, the father observes that the judge found

would enter the bathroom, turn the shower on, but not enter the shower. She was also overheard to engage in imaginary dialogue while alone in the bathroom, saying "don't make me," "I don't want to," and "go away." According to another witness, Olivette was heard while in the shower at a different facility saying "come here little girl" in a "deep voice" and responding "no no" in her own voice. In his reply brief, the father contends that the evidence of the child's imaginary dialogues should have been excluded as hearsay. However, the father does not argue for reversal based on admission of the dialogues, but instead points to them to illustrate another form of "confirmation bias."

[14]For example, the father points to the following excerpt from his cross-examination of Tamara Hillard, a sexual abuse evaluator called by the department:

> *Q.*: "So if she — since she was spending long periods of time in the shower, that's consistent with sexual abuse."
>
> *A.*: "It could be."
>
> *Q.*: "Okay. And if she had avoided the shower, if she had a deathly fear of the shower, that also could be indicative of sex abuse."
>
> *A.*: "Absolutely."
>
> *Q.*: "So the only time it wouldn't be indicative of sex abuse if she spent a normal amount of time in the shower."
>
> *A.*: "And even if she did that, it wouldn't mean that she hadn't been sexually abused."

that Olivette did not fear her father, a finding he places at odds with the suggestion that her fear of the shower (and imaginary dialogues expressing fear while in the shower) could arise from her father having abused her in the shower. However, the judge's finding concludes that Olivette did not fear her father at the time she was being abused because she was naive and unaware that the sexual abuse she experienced was wrong and traumatic. There was independent evidence at trial illustrating that Olivette later developed an understanding that the abuse was wrong, and her dissociative dialogue in the shower can readily be understood to rest, at least in part, on that later-acquired awareness.

The father also points to instances in which the experts were allowed to express their belief that Olivette had been abused in the manner she described. Such vouching is impermissible, and particularly troubling when done by an expert in a case in which the witness that is its subject does not testify. See *Care & Protection of Rebecca*, 419 Mass. at 83. However, the judge specifically eschewed reliance on those portions of the experts' opinions,[15] and as we have observed, his findings reflect careful consideration of the independent evidence supporting his conclusions that Olivette had been abused in the manner alleged. Though the admission of such testimony was error, we decline to disturb the decree on the basis of its admission when the judge did not rely on it.

Finally, the father contends that the judge should have conducted a voir dire examination of Olivette herself and that the judge separately should have considered whether accommodations could have been made to mitigate the potential trauma from testifying at trial. As to the first claim, the father observes

---

[15]The judge stated that he credited the experts' testimony "relating to characteristics of sexual assault and [post traumatic stress disorder] but gave no weight to opinions that the sexual abuse occurred, including occurring at the hands of father." The judge added that "[a]ll testimony of the parties relative to assessment of the child's credibility has been discounted and given no weight by the Court . . . ." Indeed, just before the latter statement, the trial judge acknowledged the very danger the father cites: that experts in a § 82 hearing must testify regarding the clarity of the child's statement in a manner that requires the expert to evaluate the child's ability to describe the abuse and that such testimony is to some degree in tension with the possibility that the expert may then form an opinion concerning the allegations of abuse and impermissibly vouch for the child's credibility.

Adoption of Olivette.

that the evidence of potential harm to Olivette, should she be required to testify, all rested on assessments of the harm that would result if she were required to testify about her abuse at the termination trial itself. On the question of the admissibility of her out-of-court statements under § 82, he suggests, the judge could have interviewed the child in chambers, or allowed counsel to conduct a limited examination of her on innocuous matters, solely gauged to allow an assessment of her demeanor and capacity. On the question of her unavailability as a witness for trial, he cites *Adoption of Don*, 435 Mass. 158, 167-168 (2001), and *Adoption of Roni*, 56 Mass. App. Ct. 52, 55 (2002), as examples of means to minimize the trauma suffered by young witnesses. See also *Adoption of Thea*, 78 Mass. App. Ct. 818, 826 (2011) (child allowed to testify telephonically). See generally *Opinion of the Justices*, 406 Mass. 1201, 1218-1219 (1989), quoting from *Commonwealth* v. *Brusgulis*, 398 Mass. 325, 332 (1986) ("Judges have considerable latitude in devising procedures and modifying the usual rules of trial to accommodate child and other witnesses with special needs, so long as the defendant's fair trial rights are not violated").

The father's claims are not without force. The advantages of live testimony over out-of-court statements are many. Without live testimony the judge, as finder of fact, is deprived of the opportunity to observe the demeanor and manner of expression of the witness, and the parties are deprived of the opportunity to clarify and test the veracity of the statements by means of cross-examination. See *Opinion of the Justices*, 406 Mass. at 1205-1206. Accordingly, to the extent that the statutory requirement of unavailability is met by concern for potential harm to a child witness who otherwise is competent and could be physically present to testify, a trial judge should not lightly dispense with the opportunity for live testimony, and ordinarily should consider whether any accommodations could minimize or eliminate possible harm to the child before finding the child unavailable for purposes of the statutory hearsay exception based on such concerns. See *Opinion of the Justices*, *supra* at 1218-1219.[16] In the present case, however, the judge explicitly credited testimony

---

[16]Though, as the department observes, *Opinion of the Justices*, *supra*, discussed the concerns in the context of a criminal defendant's right of confronta-

from various experts who expressed concern that Olivette would suffer severe emotional trauma should she be subject to cross-examination regarding her allegations of abuse, including testimony from Dr. Robert Fleming who observed that Olivette "became visibly anxious" during their interview, and that "she continues to be emotionally fragile . . . she is at high risk of serious regression (emotionally and behaviorally) if she were required to have to testify in any formal court proceeding." We discern no cause to disturb the decrees by reason of the judge's conclusion that accommodations regarding the manner in which Olivette might testify would not adequately eliminate the risk of harm to her if she were required to testify.[17]

We note that a trial judge might well find benefit in holding a voir dire, or simply conducting an interview, of a child whose out-of-court statements are proposed for admission under § 82, even if the subject of the voir dire or interview does not include the allegations of abuse themselves. See *Care & Protection of Rebecca*, 419 Mass. at 80 ("the legislation certainly does not foreclose the judge from holding a voir dire to assess the child's capacity to remember and to relate, and the child's ability to perceive the necessity of telling the truth"). To be sure, the

tion (but see note 6, *supra*), similar considerations apply to the value of live testimony in proceedings directed toward termination of parental rights. See *Adoption of Don*, 435 Mass. at 167-169.

[17]The father complains that the judge applied an incorrect legal standard in rejecting the possibility of having Olivette testify in camera because it would not be in her "best interest." Read in context, however, it is clear that the judge accepted the experts' opinion that Olivette would be at serious risk of regression should she be required to testify in any manner. The judge stated as follows:

"[Dr. Fleming, whose testimony was credited by the judge, testified that], given her history of major hospitalizations, [Olivette] has a high risk for regression should she be compelled to testify. He stated that the stress would be very difficult for her. [Olivette's] emotionally unstable state makes her unavailable as a witness."

And (in the immediately following finding) he also stated that:

"In this case, it was not in [Olivette's] best interest to be examined by the Court. Testimony from Dr. Fleming and Ms. Berglin, which was credited by this Court, indicated that [Olivette] would be at risk for regression should she testify in this matter. Therefore, this Court determined her to be unavailable by clear and convincing evidence."

child's capacity and demeanor will typically be the subject of extensive expert testimony, and we do not suggest that the judge should substitute his assessment for that of the experts on matters of a clinical nature. But a trial judge's observations of the child herself, in a suitably protective setting, may furnish context for the expert testimony, of assistance to the judge in his assessment of the reliability of the statements.[18] In particular cases, a trial judge might be able to limit the scope of a voir dire or interview, and to structure the setting in which it occurs, in such a manner as to avoid risk of the trauma that might arise if the child were required to testify at trial on the allegations of abuse themselves.[19] In such cases, we encourage judges to give due consideration to the potential benefits of doing so.[20]

b. *Admission of § 82 findings at termination trial.* Both parents claim error in the judge's decision to admit the § 82 findings in evidence at the termination trial over the father's objection. Citing *Commonwealth* v. *Love*, 452 Mass. 498, 507 (2008), by analogy, the parents contend that a § 82 hearing involves different questions and different legal standards than those involved in a trial seeking termination of parental rights and also that the parties might pursue different legal strategies in one than in the other. In response, the department points to *Adoption of Frederick*, 405 Mass. 1, 12 (1989), to support their contention that the judge correctly admitted the § 82 findings.

*Commonwealth* v. *Love* is inapposite, in our view. In that case, a trial judge consolidated a hearing on a criminal defendant's motion to suppress with the jury-waived trial on the charges themselves. As the Supreme Judicial Court observed, that had the effect of depriving the parties of their right, under Mass. R.Crim.P. 15(a)(2), as appearing in 422 Mass. 1501-1502 (1996),

[18]The potential value of such a voir dire is particularly acute in the present case, since the SAIN interview was not videotaped. We decline, however, to adopt the mother's suggestion (unsupported by precedent) that the failure to videotape the SAIN interview requires reversal of the decree.

[19]Each case, and each child, will doubtless present different considerations. Judges have wide latitude in structuring the manner in which any such interview or voir dire might proceed (including whether to allow counsel to question the child), in order to limit the potential for harm to the child.

[20]We note that § 82(*c*) expressly contemplates the possibility of a meeting between the judge and the child "where practicable and where not inconsistent with the best interests of the child."

to pursue an interlocutory appeal from an order on a motion to suppress. In addition, the Commonwealth's burden of proof at a motion to suppress is lower than at trial, and the proceedings operate under different evidentiary rules. In the present case, of course, the two hearings were not consolidated, and the parties accordingly were not deprived of any opportunity to seek interlocutory review of the judge's conclusion that Olivette's statements were admissible under § 82.[21] Moreover, the parents have cited no issue on which the department's burden of proof was lower in the § 82 hearing than in the termination trial, nor any evidence that was admissible in the § 82 hearing that would not have been admissible in the termination trial.

We acknowledge that *Adoption of Frederick*, 405 Mass. at 12, is not squarely on point. That case involved the question whether findings from a care and protection proceeding were binding on parties in a subsequent termination trial, concluding that they were not. However, the court also concluded that findings from the earlier proceeding are admissible in the termination trial, even though by the time of the later trial they "may be out of date, or the product of a proceeding where the parent may not have a compelling incentive to litigate." *Ibid.* Moreover, though claiming broadly that they suffered prejudice by "offering certain documents in evidence and declining to object to certain testimony at the § 82 hearing" and that the admission of the § 82 findings "fatally tainted a number of the court's termination findings," the parents have pointed to no example of evidence admitted at the § 82 hearing that would not have been admitted at the termination trial, and they have cited no termination finding that illustrates the "taint" they claim. Absent a showing of prejudice, we reject the parents' contention that the admission of the § 82 findings in evidence at the termination trial requires reversal of the decree.

c. *Unfitness.* The parents separately argue that the findings of fact do not support the ultimate conclusion of parental unfitness. We disagree.

Before terminating the legal relationship between a parent and child, pursuant to G. L. c. 210, § 3, a judge must determine

---

[21]In these circumstances, such review would have been available under G. L. c. 231, § 118.

by "clear and convincing evidence that the parent is currently unfit to further the child's best interest." *Adoption of Carlos*, 413 Mass. 339, 348 (1992). See *Care & Protection of Martha*, 407 Mass. 319, 327 (1990). The inquiry is whether the parent's deficiencies "place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child." *Care & Protection of Bruce*, 44 Mass. App. Ct. 758, 761 (1998). "Subsidiary findings must be established by a fair preponderance of the evidence . . . and will not be disturbed unless clearly erroneous." *Adoption of Elena*, 446 Mass. 24, 30-31 (2006) (internal citations omitted). We accord deference to a trial judge's assessment of the credibility of witnesses and the weight of the evidence. *Id.* at 31.

Because we have concluded that the judge correctly admitted Olivette's allegations of sexual abuse based on his conclusion (supported by the evidence at the § 82 hearing) that they were reliable, the judge's conclusion regarding the father's unfitness is clearly supported.

The mother contends that the evidence of her unfitness was insufficient, because there was no nexus between her disbelief of Olivette's allegations and any resulting harm to the child. However, "[u]nfitness is not based solely on a parent's affirmative conduct but partakes of an assessment of the parent's 'character, temperament, capacity and conduct.' " *Petition of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 15 Mass. App. Ct. 161, 164 (1983), quoting from *Petition of the Dept. of Pub. Welfare*, 383 Mass. 573, 589 (1983). In the present case, the finding that the mother is unfit did not rest solely on her disbelief of the allegations; not only did the mother refuse to acknowledge the trauma suffered by Olivette,[22] but she actively resisted the department's efforts to help Olivette by refusing to disclose her address to the department investigator and by stating that "she could kill [Olivette] for saying that." The mother in fact did not

---

[22]The mother claims that the record does not support the judge's finding that she refused to acknowledge Olivette's trauma. She claims that all she did "was refuse to believe her 9-year-old, mentally retarded daughter who has a long, documented history of fabricating stories in order to get attention." It was the prerogative of the judge to weigh the properly admitted evidence of sexual abuse against the mother's view. Here, his finding was not clearly erroneous. See *Adoption of Elena*, 446 Mass. at 31.

live with Olivette at the time of the disclosures, having left the child in the father's primary care after their divorce. Moreover, after Olivette was removed from the father's care, the mother failed to comply with any of the tasks in the department's service plan, which included meeting with a department worker, participating in a parenting evaluation, attending individual counselling, or visiting with Olivette, among other tasks. See *Petitions of the Dept. of Social Servs. to Dispense with Consent to Adoption*, 399 Mass. 279, 289 (1987) (evidence parents refused to maintain service plans and counselling programs designed to strengthen family unit relevant to determination of unfitness). Finally, the evidence supports the judge's findings that the mother did not wish to take custody of Olivette, that she expressed a desire to move on with her life, and that she has been "weaning" herself out of Olivette's life by reducing visits with her.[23] The judge did not err in terminating the mother's parental rights. See *Adoption of Elena, supra* at 30-31. Compare *Adoption of Carlos*, 413 Mass. at 351 (finding that mother had made "significant progress" by no longer denying that her child had been sexually abused).

*Decrees affirmed.*

---

[23]The mother asserts that her statements expressing a hesitancy to visit Olivette were based on concern for Olivette's best interest. However, in light of the mother's statements that she was not interested in being united with Olivette, that the father pushed the adoption "which [she] did not want," and that Olivette "likes men better than woman [*sic*]," the judge's conclusion that the mother was uninterested in taking custody of Olivette has sufficient record support.