NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

24-P-118

ADOPTION OF NIGEL.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The mother and her son Nigel appeal from a decree issued by a judge of the Juvenile Court finding the mother unfit and terminating her parental rights to Nigel.[2]  Concluding that there was no error in the determination of unfitness but that the record failed to support the finding that termination was in the best interests of Nigel, we vacate the termination portion of the decree and remand for further findings.

Background.  In July 2010, Nigel was born.  The mother had four older children with another father.  The mother described her relationship with the older siblings' father as a domestic

_____

[1] The child's name is a pseudonym.

[2] The judge also terminated the parental rights of Nigel's putative father "and any unknown or unnamed father."  The putative father did not appeal.  Nigel's siblings are not parties to this appeal.

violence relationship.  After their relationship ended, the mother and her children moved into her father's home.  In December 2013, a G. L. c. 119, § 51A, report was filed alleging a domestic violence incident between the mother, her new boyfriend, and her father while the children were present.  The mother reported that she had a fight with her father, and he had "kicked the family out of the home."  In March 2014, the mother, her boyfriend, and the children lived together at a shelter.  By February 2015, the mother and the children had moved out of the shelter and into an apartment.

In June 2015, the mother met another man (stepfather) and married him a month later.  In November 2016, the mother received an abuse prevention order against the stepfather pursuant to G. L. c. 209A (209A order).  In her affidavit in support of her request for the 209A order, the mother described the stepfather as sexually and emotionally abusive.  The mother averred that her children feared the stepfather and that she sought the 209A order for her children's safety.  The mother also described the stepfather as "controlling" and reported that he had hit her.  The mother failed to renew the 209A order and it expired three weeks later.  In April 2017, the family, including the stepfather, moved into a shelter.

In May 2017, two of the children became involved in a physical altercation between the mother and the stepfather, and

one of Nigel's sisters was left bleeding from the face after the stepfather slapped her.  Although the children confirmed the assault, the mother denied any violence by the stepfather.  As a result of this incident, the Department of Children and Families (department) removed the children from the home.  One week after removal, the mother became homeless.

Nigel spent time at different foster homes, until he settled in a residential treatment program, where he lived from 2018 to 2021.  In 2019, the mother stipulated to her unfitness.  The judge determined that it was in Nigel's best interest to remain in the department's custody.

By November 2020, Nigel had been diagnosed with developmental delays, attention deficit hyperactivity disorder, posttraumatic stress disorder, and oppositional defiant disorder; and he was also in need of a neuropsychological evaluation.  As of June 2021, Nigel was in fifth grade, and he had an individualized education program through which he received substantial support for his significant learning disabilities, including language development.

In November and December 2021, the judge held a review and redetermination hearing via Zoom.  At the time, the mother lived with the stepfather in a studio apartment.  The mother had no plans to move to a larger apartment that could accommodate her children nor any intention to leave the stepfather, and she

risked losing the apartment because the stepfather was not authorized to live there. The mother attended the hearing from outside her apartment in thirty-eight degree weather because she did not want to disturb the stepfather while he showered and napped.

Discussion. "To terminate parental rights to a child and to dispense with parental consent to adoption, a judge must find by clear and convincing evidence, based on subsidiary findings proved by at least a fair preponderance of evidence, that the parent is unfit to care for the child and that termination is in the child's best interests" (citation omitted). Adoption of Oren, 96 Mass. App. Ct. 842, 844 (2020).

1. The mother's unfitness. The parent's fitness is "determined by taking into consideration a parent's character, temperament, conduct, and capacity to provide for the child in the same context with the child's particular needs, affections, and age." Adoption of Mary, 414 Mass. 705, 711 (1993). "The inquiry is whether the parent's deficiencies place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child" (quotation and citation omitted). Adoption of Olivette, 79 Mass. App. Ct. 141, 157 (2011).

"It is well established that exposure to domestic violence works a 'distinctly grievous kind of harm' on children, . . . and instances of such familial violence are compelling evidence

4

for a finding of parental unfitness." Adoption of Talik, 92 Mass. App. Ct. 367, 374 (2017), quoting Custody of Vaughn, 422 Mass. 590, 595 (1996). "A judge may properly consider a parent's decision to remain in a relationship with an abusive partner in determining parental fitness." Adoption of Jacob, 99 Mass. App. Ct. 258, 265 (2021).

Here, the evidence showed that the mother suffered years of domestic abuse from a series of men while her children were present. At times, the children even became embroiled in the violence. Her husband, the stepfather, was emotionally, physically, and sexually abusive to the mother, and the children were afraid of him. Nevertheless, the mother intended to remain in her relationship with the stepfather and denied that there was domestic violence with him. Although the mother testified that the stepfather was not physically violent with her or her children, the judge "was not obliged to believe the mother's testimony" (citation omitted). Custody of Eleanor, 414 Mass. 795, 800 (1993).

We are unpersuaded by the mother's contention that the evidence of domestic violence was stale by the time of trial.[3]

_____

[3] The mother also asserts that several of the judge's findings relating to domestic abuse improperly relied on hearsay contained in certain documentary exhibits. Because there was no objection at trial to the admission of the foster care review and G. L. c. 119, § 51B, reports, that part of the argument is

As the judge found, despite efforts by the department to intervene, the mother did not make any meaningful changes in her approach to the pattern of domestic abuse she had suffered or in her appreciation of its harmful impact on her children. See Adoption of Ulrich, 94 Mass. App. Ct. 668, 677 (2019) (parent's failure to benefit from services "relevant to the determination of unfitness" [citation omitted]). "Although stale information cannot be the basis for a finding of current parental unfitness[,] . . . [p]rior history . . . has prognostic value" (quotation and citation omitted). Adoption of Jacques, 82 Mass. App. Ct. 601, 607 (2012).

The unresolved domestic violence issues were also intertwined with the lack of suitable housing for Nigel. Although "children should never be removed from their parents . . . on the sole basis of homelessness of a family[,]" (citation omitted), Adoption of Linus, 73 Mass. App. Ct. 815, 821 (2009), a judge may properly consider whether a child will have "adequate stable housing" in determining a parent's

---

waived. See Adoption of Kimberly, 414 Mass. 526, 534-535 (1993). Even if the mother's challenges were preserved and some hearsay was improperly admitted, the findings concerning the abusiveness of the relationship between the stepfather and the mother and her inability to address the children's protective needs were supported by ample other evidence. See Adoption of Yalena, 100 Mass. App. Ct. 542, 553 (2021) ("a finding of unfitness may stand if, [despite erroneous findings,] . . . termination remains supported by other clear and convincing evidence").

6

unfitness.  Adoption of Anton, 72 Mass. App. Ct. 667, 676 (2008).  The mother struggled with homelessness throughout this case.  At trial, the mother admitted that the stepfather lived in her apartment in violation of her housing voucher.  The judge thus properly found that the mother had no "suitable plan for housing if the children were returned to her care."  We conclude that clear and convincing evidence amply supported the judge's determination that the mother was unfit to parent Nigel and that the unfitness was not temporary.

2.  The best interests of the child.  "[T]he 'parental fitness' test and the 'best interests of the child test' are not mutually exclusive, but rather 'reflect different degrees of emphasis on the same factors.'"  Adoption of Garret, 92 Mass. App. Ct. 664, 671 (2018), quoting Care & Protection of Three Minors, 392 Mass. 704, 714 (1984).  "We give substantial deference to a judge's decision that termination of a parent's rights is in the best interest of the child, and reverse only where the findings of fact are clearly erroneous or where there is a clear error of law or abuse of discretion."  Adoption of Ilona, 459 Mass. 53, 59 (2011).

In making a best interests determination, the judge considers "'the ability, capacity, fitness and readiness of the child's parents' as well as 'the plan proposed by [the department].'"  Adoption of Garret, 92 Mass. App. Ct. at 675,

7

quoting Adoption of Nancy, 443 Mass. 512, 515-516 (2005). "The law does not require that the adoption plan be fully developed in order to support a termination order, but it must provide sufficient information about the prospective adoptive placement so that the judge may properly evaluate the suitability of the department's proposal" (quotations and citation omitted). Adoption of Varik, 95 Mass. App. Ct. 762, 770 (2019). In addition, the plan must be "sufficiently detailed to permit the judge to evaluate the type of adoptive parents and home environment proposed and consider whether the proposal is best suited to meet the specific needs of the child." Id. at 770-771.

Here, the department's plan "did not detail [Nigel]'s specific ongoing needs, nor did it describe the specific characteristics of the ideal family that would be recruited by the department or the necessary home environment that would be the best and most appropriate placement for him." Adoption of Varik, 95 Mass. App. Ct. at 766. Although the plan included a brief overview of Nigel's placement history, diagnoses, and behavior, it failed to lay out his considerable social, emotional, and cognitive challenges. Contrast Adoption of Xarissa, 99 Mass. App. Ct. 610, 623 (2021) ("department extensively detailed the child's diagnoses and treatment, and described several child-specific resources that may be

8

appropriate for her once she is in a position to be adopted"). Rather than provide details of the characteristics of an appropriate adopter, the plan merely stated the department was "confident that, were parental rights terminated, an appropriate adoptive home will be identified."

Moreover, it appears that the judge failed to consider that at the time of trial, Nigel was only months away from being old enough to block his own adoption, see G. L. c. 210 § 2, and he had repeatedly stated his desire to return to his mother. As the judge found, Nigel has a "meaningful relationship" with the mother. In contrast, there is no evidence that Nigel has a bond with any other caretaker. Based on the plan's lack of detail and Nigel's particular needs, age, and likely intent to block any potential adoption, we conclude that it was error for the judge to find that termination of the mother's parental rights to Nigel was in Nigel's best interests. See Adoption of Ramona, 61 Mass. App. Ct. 260, 266-267 (2004).

Conclusion. So much of the decree finding the mother unfit is affirmed. That portion of the decree that terminates the mother's rights with respect to Nigel is vacated and the case is remanded to the Juvenile Court for further proceedings and findings consistent with this decision. On remand, the judge shall reconsider the termination portion of the decree, taking into account Nigel's wishes, and shall determine whether it is

9

in Nigel's best interests to have his mother's parental rights terminated.  See Adoption of Ramona, 61 Mass. App. Ct. at 266-267; Adoption of Flora, 60 Mass. App. Ct. 334, 343 (2004).

So ordered.

By the Court (Shin, Ditkoff & Brennan, JJ.[4]),

Paul Little

Clerk

Entered:  October 28, 2024.

---

[4] The panelists are listed in order of seniority.