NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-1018

ADOPTION OF BODHI.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The father appeals from a Juvenile Court decree finding him unfit to parent his child, Bodhi, terminating his parental rights, and committing Bodhi to the custody of the Department of Children and Families (department).[2]  The father argues that the judge erred by failing to credit evidence of his engagement with services and lack of domestic violence during the years preceding the trial and by failing to evenhandedly assess the competing placement plans.  We affirm.

Background.  The father was born in 1974 and has been known to the department since about 1995.  He has eleven children,

_____

[1] A pseudonym.

[2] The mother entered into an open adoption agreement on the first day of trial and stipulated to the termination of her parental rights.  She did not appeal.

including Bodhi, with six different women, and his parental rights were terminated as to the two oldest children. The father also did not raise any of the ten oldest children, who are now all adults, in part because he was frequently incarcerated.

The father has an extensive history of domestic violence and was the defendant in twenty-two restraining orders over three decades; in addition, a significant share of his eighty criminal charges arose from domestic violence. The majority of the restraining orders were filed by the father's girlfriends over the years. During one of his most recent acts of domestic violence, the father gave the mother two black eyes, broke her finger, and injured her back and shoulder when she was six months pregnant with Bodhi.

Bodhi was born in 2019. One day later, a mandated reporter filed a report under G. L. c. 119, § 51A (51A report), alleging neglect of Bodhi by the mother. According to the report, the mother tested positive for marijuana upon admission to the hospital, and Bodhi was born substance exposed. A department social worker investigated the allegations and learned of the father's domestic violence history. After a home visit and interviews with the parents, the social worker deemed the allegations in the 51A report supported, and the case opened for services.

2

Bodhi remained in his parents' custody for the next two and one-half years, during which time the department had ongoing concerns about domestic violence between the parents. These concerns came to a head at the end of 2021. That November, a mandated reporter filed a 51A report alleging that police responded to the parents' home after the mother called to report a domestic incident. According to the report, the father claimed that the mother was intoxicated and throwing objects, whereas the mother claimed that the father was throwing objects and had picked her up by her shoulders, pinned her against a wall, and grabbed her neck. The report also stated that a neighbor saw the father throw the mother to the ground. When a department social worker visited the home a week later, the father reported that the mother's alcohol use had increased and that she was using "crack." The social worker then presented the parents with a safety plan, which provided among other things that the father would ensure that the mother would no longer act as a sole caretaker for Bodhi. Both parents agreed to the plan.

In December 2021 the social worker conducted an unannounced home visit, during which she discovered that the father had violated the safety plan by allowing the mother to be alone with Bodhi. The social worker also saw that a bedroom door had holes in it and was ripped off its hinges, the television was off the

stand, and its screen was broken.  The mother reported that the father broke these items and their cell phones out of anger.  The department removed Bodhi from the parents' care, citing, among other things, the mother's substance abuse, the domestic violence between the parents, and their failure to abide by the safety plan.

Subsequently, the mother filed for a restraining order against the father, which was granted, causing the father to move to a hotel.  In January 2022 officers responded to the hotel after receiving a report of a man kicking in a room door.  The officers saw a damaged door frame and a crack in the sheetrock and learned that the caller was the father's adult son.  The officers then viewed video footage, which showed the father "shoulder checking" the door.

The father's violent behavior continued from there, requiring further police interventions.  In May 2022 officers were dispatched to the mother's apartment for a past disturbance.  The mother told them that the father had been at her apartment the night before and began arguing with her, that she threw food and utensils at him, and that he retaliated by throwing a knife, which stuck into her leg.  The officers saw that the mother's pants had blood stains and a hole and requested a warrant for the father's arrest.

4

In September 2022 officers responded to the mother's home after receiving complaints of noise and a "bloodied female." They found the mother outside, upset and crying, with scratches and red marks on her face and neck; she was having trouble speaking but told the officers that she had an altercation with the father. The officers entered the apartment, found the father inside, and arrested him. After the father was taken away, the mother told the officers that he had grabbed her head, smashed her face into the bathroom door approximately five times, and put her in a chokehold that made her unable to breathe.

As a result of this incident, the father pleaded guilty to assault and battery, assault and battery by means of a dangerous weapon, and "strangulation/suffocation." He was incarcerated for approximately nine months and was released in June 2023, ten months before trial in this case. At trial the father testified that some of the things he pleaded guilty to in September 2022 were true and some were not true, but ultimately he acknowledged that he had strangled the mother and had stabbed her in the leg in May 2022.

Between December 2021 and January 2024, the father did not engage in domestic violence services, despite social workers providing him with numerous referrals and information explaining how to register for them. Although the father testified that he

5

completed several domestic violence courses during his incarceration, he never provided the department with any certificates of completion, and the judge did not credit his testimony to the contrary. In January 2024 the father was sent a violation of probation notice, as he still had not completed an intimate partner program as required by the conditions of his probation.[3] The father finally began attending a domestic violence program on January 31, 2024, a few months before trial began and more than two years after Bodhi was removed. He had not completed the program as of the time of trial.

Discussion. 1. Unfitness and termination. In determining whether to terminate parental rights, a judge must first find by clear and convincing evidence that the parent is unfit. See Adoption of Nancy, 443 Mass. 512, 515 (2005). "Despite the moral overtones of the statutory term 'unfit,' the judge's decision is not a moral judgment, nor is it a determination that the parent does not love the [child]." Adoption of Lisette, 93 Mass. App. Ct. 284, 285 n.2 (2018). Instead, "[t]he inquiry is whether the parent's deficiencies 'place the child at serious risk of peril from abuse, neglect, or other activity harmful to the child.'" Adoption of Olivette, 79 Mass. App. Ct. 141, 157

---

[3] The father was found in violation of his probation on April 3, 2024, and sentencing was scheduled for October 2, 2024, a couple months after trial ended in this case.

6

(2011), quoting Care & Protection of Bruce, 44 Mass. App. Ct. 758, 761 (1998).

Here, the undisputed evidence of the father's history of domestic violence supports the judge's finding of unfitness. The judge's subsidiary findings, which the father does not challenge on appeal, establish that the father committed violent acts against the mother as part of a longstanding pattern, which created a hostile home environment rife with domestic abuse. This abuse occurred when the mother was pregnant with Bodhi and continued during the time Bodhi lived with the father. The department eventually removed Bodhi because of ongoing domestic violence between the parents and because they had violated the safety plan that both had agreed to. Even after Bodhi's removal, the father continued to commit violent acts against the mother, including throwing a knife at her, smashing her face into a door, and putting her in a chokehold. In addition, the judge found that the father was often aggressive and threatening toward department social workers. For example, during one home visit, the father became angry and told the worker, "You're the reason social workers get killed."

As the judge further found, the father, despite admitting to some of his violent acts, never took full responsibility for his conduct. The father failed to engage in domestic violence services for over two years, not starting them until a few

7

months before trial, and at trial he claimed that most of the restraining orders against him arose from verbal altercations, which the judge did not credit. The father also claimed that Bodhi never witnessed any of the domestic violence and that the father had benefited or changed from engagement in services, which again the judge did not credit. The father's long history of domestic violence, coupled with his failure to adequately engage in or benefit from services and his efforts to minimize his behavior and deny the impact of domestic violence on Bodhi, clearly and convincingly establish his unfitness. See Adoption of Yvonne, 99 Mass. App. Ct. 574, 577-578 (2021).

We are unpersuaded by the father's argument that the judge erred by not giving more weight to the father's engagement in some services and the absence of domestic violence committed by him in recent years. The judge acknowledged that the father completed some of his action plan tasks, such as meeting with the department each month, signing information release forms, engaging in individual therapy, completing a six-week parenting course, and attending all meetings and court hearings pertaining to Bodhi. But where domestic violence is the central issue in the case, the judge was justified in concluding that the father's failure to complete any domestic violence courses and his failure to benefit from some classes he did take outweighed his completion of these other action plan tasks. See Adoption

of Ulrich, 94 Mass. App. Ct. 668, 677 (2019). Furthermore, to the extent the father is arguing that the evidence of domestic violence was stale, we disagree. The father was not released from incarceration until ten months before trial, did not complete a domestic violence program after his release even though it was required by probation, and continued to deny and minimize his behavior at trial. Thus, rather than being stale, the evidence had continuing vitality. See Adoption of Flavia, 104 Mass. App. Ct. 40, 49 (2024).

For the same reasons, the judge did not err in concluding that termination of the father's parental rights would be in Bodhi's best interests. "The 'best interests of the child' standard requires the trial judge to make a discretionary decision based on her experience and judgment, and will not be overturned unless it amounts to an abuse of discretion or a clear error of law." Adoption of Garret, 92 Mass. App. Ct. 664, 675 (2018). Here, the judge found that the father's failure to meaningfully address his history of domestic violence and criminal activity established that his unfitness would continue undiminished into the future, warranting termination of his parental rights. This was not an abuse of discretion. See Adoption of Breck, 105 Mass. App. Ct. 652, 661 (2025).

2. Placement plan. The department's proposed placement plan was adoption by Bodhi's preadoptive parents, which the

9

judge found would be in Bodhi's best interests.  The father argues that this was error because the judge did not evenhandedly assess the father's alternative plan, which was for Bodhi to live with his paternal grandmother (grandmother).  We disagree.

As an initial matter, the father's argument is waived because he did not actually propose a placement plan at trial.  See Adoption of Jacob, 99 Mass. App. Ct. 258, 270-271 (2021) ("Ordinarily, a party is not entitled to present an argument on appeal on an issue not presented in the court below" [citation omitted]).  Instead, the father and the grandmother both testified that their desired result was for Bodhi and the father to be reunified and live together in the grandmother's home, with the grandmother serving as a support.  Neither the father nor the grandmother testified that she was willing or able to provide permanency for Bodhi.

Even setting aside the waiver, moreover, the father's argument would not succeed.  "In choosing among placement plans, it falls to the sound discretion of the trial judge to determine what is in the best interests of the child, and our review on appeal is one of 'substantial deference.'"  Adoption of Bianca, 91 Mass. App. Ct. 428, 434 (2017), quoting Adoption of Hugo, 428 Mass. 219, 225 (1998), cert. denied sub nom. Hugo P. v. George P., 527 U.S. 1034 (1999).  By the time of trial, Bodhi was five

10

years old and had lived for a year with the preadoptive family. The judge found that during this year Bodhi formed a strong connection with the family, which consisted of the parents and their six year old daughter. Bodhi called the parents "mama" and "dada" and enjoyed playing with them and his foster sister. The judge found that the preadoptive parents could meet Bodhi's needs.

In contrast, the judge found that the grandmother's "work schedule has not allowed her to meet all [of Bodhi's] needs" and that she was "therefore not a viable placement option." Bodhi lived with the grandmother for the six months following his removal from the parents' custody and one night in departmental foster care. Eventually, however, the department had to transition Bodhi out of the grandmother's home because her sister-in-law, who often cared for Bodhi when the grandmother was away at work, was no longer able to assist. The grandmother's schedule had not changed by the time of trial, and she did not explain in concrete terms who would be caring for Bodhi in her absence. In addition, the judge found it concerning that the grandmother believed that the father was wrongfully imprisoned, that he had never assaulted the mother or any other women, and that he was capable of parenting Bodhi. In light of this evidence, the judge did not abuse her discretion in determining that the grandmother was not a viable placement

11

option and that the department's plan for adoption by the preadoptive parents would be in Bodhi's best interests.

<u>Decree affirmed</u>.

By the Court (Henry, Shin & Toone, JJ.[4]),

Clerk

Entered: May 8, 2026.

---

[4] The panelists are listed in order of seniority.

12